Commonwealth of the **NORTHERN MARIANA ISLANDS, Plaintiff–Appellee,**

v.

**Joseph A. BOWIE, Defendant–Appellant.**

**No. 99–10552.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 13, 2000

Filed Jan. 10, 2001

Amended March 23, 2001

G. Anthony Long, San Jose, Saipan, MP, for the defendant-appellant.

Kevin A. Lynch, Office of the Attorney General, Commonwealth of the Northern Mariana Islands, Saipan, MP, for the plaintiff-appellee.

Before: HUG, Chief Judge, TROTT, and WARDLAW, Circuit Judges.

## ORDER

The Opinion filed January 10, 2001, and appearing at 236 F.3d 1083 (9th Cir.2001) is amended as follows:

Page 1095, immediately following the last sentence before the heading "CONCLUSION," insert the following language:

The Attorney General argues that without actual proof of perjury in the record as it now stands, it is premature to order a new trial. The Attorney General asks us to remand this matter to the trial court for a full evidentiary hearing to determine whether any of the witnesses actually lied as suggested by the letter. As support for this position, the Attorney General notes that in the controlling cases, the record justified the conclusion that perjury did in fact infect the trial and result in a denial of due process. The Attorney General's argument misses the mark in this case.

First, we cannot help but note the irony in an argument that asks years after a trial for an opportunity to do what the Constitution required of the proponent of the argument *before* the trial began to ensure that it would be fair. It is the Attorney General who is directly responsible for what he now says is unclear from the record and for the deficiencies in the trial that took place. Given the manifest reason to question the veracity of the prosecution's witnesses, the Constitution required a prompt pretrial investigation of the integrity of the government's evidence before the witnesses were called to the stand. This requirement is not satisfied by a tardy evidentiary hearing after the fact. Although the prosecution had leverage before the trial to get to the truth with its witnesses, it is not unlikely now that the Fifth Amendment will shield them from the inquiry the prosecution wishes to launch. By committing the witness under oath to a certain story, an admission now of untruthfulness might well unveil a crime.

Second, when Reyes's counsel attempted to introduce handwriting evidence to establish that Reyes did not write the letter, the Attorney General's representative objected and blocked evidence on a crucial part of the issue it now says it wants to examine.

Third, the record as it stands establishes bad faith with regard to this issue on the part of the Attorney General's Office prior to and during the trial, i.e., a

knowing violation of its ethical obligations.

In conclusion, the clear defects in Bowie's trial were the direct result of the prosecutor's pretrial constitutional failure to guard against improbity in the trial process, a failure which rendered the trial itself patently unfair in due process terms. The prosecution saw fit without prophylaxis to call to the stand witnesses whom it had clear reason to believe might have conspired to lie under oath. The manner in which the trial unfolded leaves us with the definite conviction that the process itself lacked fundamental fairness and delivered a palpably unreliable result. In this connection, the principles which compel our decision here are not designed to punish society for the misdeeds of a prosecutor, *see United States v. Agurs*, 427 U.S. 97, 110 n. 17, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), but to vindicate the accused's constitutional right to a fair trial, a fundamental right for which the prosecution shares responsibility with the courts.

With this amendment, the panel has voted unanimously to deny the appellee's petition for rehearing. The petition for rehearing is DENIED.

## OPINION

TROTT, Circuit Judge:

Appellant Joseph A. Bowie ("Bowie") appeals a judgment originating from the Superior Court of the Commonwealth of the Northern Mariana Islands ("CNMI") encompassing convictions for the premeditated murder in 1992 of Elaudio Laude ("Laude"), and for the kidnaping of Laude and his friend, Nilo Rivera ("Rivera"). The Supreme Court of the CNMI has signaled its affirmance of the convictions in a *pro forma* two-paragraph decision dated September 13, 1999, but has not yet published an opinion explaining its rationale.

Bowie asks us to reverse his convictions and to grant him a new trial, citing *inter alia* the Commonwealth's admitted decision before the trial not to investigate concrete documentary evidence suggesting that the prosecution's accomplice witnesses against Bowie—who had been granted leniency in return for their testimony—were conspiring to testify falsely against him.

Because we conclude that the Commonwealth's unjustifiable refusal to act deprived Bowie of liberty without due process of law in violation of the Fourteenth Amendment of the Constitution, we reverse and remand for a new trial.

## JURISDICTION

We have jurisdiction over final decisions of the CNMI Supreme Court "from which a decision could be had in all cases involving the Constitution, treaties or laws of the United States." 48 U.S.C. § 1824(a). Our jurisdiction over appeals from judgments of the CNMI Supreme Court is similar to the United States Supreme Court's jurisdiction over the final judgments and decrees of the highest state courts in cases involving the Constitution, treaties, or laws of the United States. *See* 28 U.S.C. § 1257; *Sonoda v. Cabrera*, 189 F.3d 1047, 1050 (9th Cir.1999); *Santos v. Nansay Micronesia, Inc.*, 76 F.3d 299, 301 (9th Cir. 1996). Accordingly, we possess jurisdiction to review federal issues presented to or decided by the CNMI Supreme Court. *See Milne v. Hillblom*, 165 F.3d 733, 735 (9th Cir.1999). In this case, we have examined Bowie's briefs in that court and determined that the issues raised here were squarely presented in federal constitutional terms to that tribunal.

We have cause to question our jurisdiction, however, because although the CNMI Supreme Court affirmed Bowie's convictions as to all issues raised on appeal, finding no error or abuse of discretion, that court said:

> The Court in this appeal has decided to issue its decision at this time and to issue its reasoning and analysis upon its finalization at a subsequent date. The time for reconsideration or further appeal, if permissible, shall not start to run until the reasoning and analysis memorandum is entered and filed.

The CNMI Supreme Court has not yet issued this reasoning and analysis memorandum, apparently because of turnover on the court. Thus, the jurisdictional question is whether the September 16, 1999 decision of the CNMI Supreme Court is "final."

The Government contends that the September 16th decision is an interlocutory order because the CNMI Supreme Court did not intend its decision to have the finality of a judgment, as indicated by its mandate that the time for appeal would not commence until the reasoning and analysis memorandum was issued. Bowie contends that our jurisdiction is not affected by the CNMI Supreme Court's failure to issue an explanatory memorandum because the September 16th decision conclusively affirms Bowie's conviction. We have jurisdiction to determine our own jurisdiction. *See Milne*, 165 F.3d at 735; *Ferreira v. Borja*, 93 F.3d 671, 673 (9th Cir.1996).

■ The September 16th decision is not "final" in the strict sense of a "decree that leaves nothing further to be addressed by the [local] courts." *American Export Lines, Inc. v. Alvez*, 446 U.S. 274, 277, 100 S.Ct. 1673, 64 L.Ed.2d 284 (1980). However, the Supreme Court has chosen not to mechanically interpret the concept of "final judgment," electing instead to recognize certain categories of judgments exhibiting sufficient characteristics of finality to warrant an assertion of appellate jurisdiction. *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 477–87, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975). We have interpreted *Cox* as enabling us to review federal issues in cases from the CNMI Supreme Court even though further proceedings are pending, when (1) the federal issue is conclusive or will survive the further proceedings and require adjudication, or (2) the outcome in that court is preordained. *See Wabol v. Villacrusis*, 958 F.2d 1450, 1453–54 (9th Cir.1990) (concluding that appellate jurisdiction existed even though the decision in question was "not final in the strict sense of a decree that leaves nothing further to be addressed").

Here, the outcome is preordained because the CNMI court unequivocally affirmed the conviction and found no error or abuse of discretion. Additionally, the federal issues raised in both courts are conclusive and will survive the further proceedings.

Thus, we conclude that the CNMI Supreme Court's September 16th decision is final for purposes of this appeal.

## FACTS

On November 5, 1992, Bowie and his companion Efrain Reyes became embroiled in an alcohol-fueled dispute with Rivera and Laude over a near collision between their automobiles. All four were intoxicated, and the trouble started when Rivera and Laude almost ran into a vehicle driven by Bowie. Under the pretense that they were police officers, Bowie and Efrain Reyes escorted the inebriated Rivera and Laude to Efrain's brother Mario Reyes's house. Once in the house, Rivera and Laude, who were Filipinos, were savagely beaten apparently by an array of Chamorros consisting of the Reyes brothers and Bowie's friends, most of whom were related. The attackers then tied their victims' wrists and deposited them in the trunk of Laude's car. After another round of drinking beer and discussing whether and how to kill their captives, two of the assailants, Lucas Manglona and Bruce Lee Manglona, drove the car from the area, followed closely by Bowie who was driving a company Toyota van owned by Paul's Milk. Mario Reyes was in the front passenger seat of the van. Somehow Rivera escaped, but Laude was not so fortunate. His mangled and dead body was found the next morning along the side of a road, and his abandoned car was recovered at another location—burned.

Mario Reyes and his brother Efrain were soon arrested for these horrific crimes along with Bowie and most of the rest of this band of thugs. During the criminal investigation, most of Laude's and Rivera's assailants and kidnappers were

given favorable plea agreements in return for their anticipated full cooperation and truthful testimony against Bowie and Mario Reyes. John Villagomez ("John"), Bruce Lee Manglona ("Brasslley"), and Lucas Manglona ("Lucas") were promised probation, and Efrain Reyes was allowed to plead guilty to two lesser assault charges carrying an actual sentence of nine years in prison. Eventually, John, Brasslley, Lucas, and Mario's brother Efrain all testified against Bowie, collectively painting an evidentiary picture of Bowie's personal responsibility for Laude's death. In essence, the accomplice witnesses testified that Bowie kicked both victims as they lay on the ground, and stomped on their arms and legs with his "safety shoes" in an attempt to break their bones. During the trip to dispose of the victims, a trip allegedly suggested by Bowie, the victims somehow escaped from the trunk of the car, and Bowie, according to the accomplices' testimony, purposefully rammed the van into Laude and dragged him for at least 96 feet on the road.

Shortly after Mario's arrest, Sergeant Pedro Camacho San Nicolas routinely checked him in his cell. During this process, Sergeant San Nicolas saw Mario holding a piece of yellow writing paper in his hand. When Mario saw Sergeant San Nicolas, he crumpled the paper and put it in the trash. Sergeant San Nicolas eventually retrieved the paper and turned it over to Sergeant Joseph Aldan, one of the chief investigators in this case. Sergeant San Nicolas could not shed any light on whether Mario had written the letter, or merely received it from someone else. The verbatim text of this letter is as follows:

> Hey brod I want you to help me please for this problem that were facing right now because if they know that Im the one that did this theyre gonna put me in jail for life. I tried this before. Brah this Is what we gonna do listen carefully okay if we go to court on Thursday and they ask us questions how the murder happens and who kill the philipino just say J.J. because I already talk to John

and Brasslley before I was arrested but anyway don't worry about Lucas because I talk to Lucas that don't tell the detectives that Im the one that did this things.

> You know what brah, don't worry about this case because well win this just imagine four against one I I even lied to my lawyer about the incedent.

This letter was unsigned.

Upon reading the letter, Sergeant Aldan took it immediately to Assistant Attorney General Ron Hammett, the Chief of the Criminal Division in the Attorney General's Office who was in charge of this case. Sergeant Aldan was seeking guidance from Mr. Hammett as to how to follow up on the information in the letter. Sergeant Aldan understood from the letter and his investigation that "John" was John Villagomez, that "Brasslley" was Bruce Lee Manglona, that "Lucas" was Lucas Manglona, and that "J.J." was the defendant Bowie. Sergeant Aldan acknowledged during the trial (1) that the letter was directed to "bro," or "brah," which is slang for brother; (2) that Efrain Reyes was Mario Reyes's brother; and (3) that both brothers were in jail on November 17, 1992, the day the letter was found. As to the deceased "philipino," Aldan understood that the decedent Laude was a Filipino, as was Rivera. Most importantly, Sergeant Aldan recognized from the content of the letter that "a plan was being developed to blame the death of the Filipino [Laude] on J.J. . . . ." At trial, Sergeant Aldan testified as follows: "I believe in my opinion Mario was involved like the rest in this case but now he wanted to blame [it] on Mr. Bowie."

When asked what Assistant Attorney General Hammett advised him to do with the letter, Sergeant Aldan testified that "[h]e basically told me not to do anything with the letter, just to keep it until we need it."

The Attorney General candidly admits—as the record plainly demonstrates—that Mr. Hammett did tell Sergeant Aldan to do nothing with the letter, and that Ser-

geant Aldan followed Mr. Hammett's terse instructions as delivered. Although they had just recently been interviewed about these crimes, neither John, nor Brasslley, nor Lucas, nor Efrain ever was asked by the prosecution team a single question about the letter or about any conversation they might have had with Mario or Efrain in connection with a possible frame-up of Bowie or a coverup in favor of Mario. Sergeant Aldan's testimony reveals that (1) his department purposefully did not conduct an investigation as to who wrote the unsigned letter, (2) that the letter was not given for analysis to a handwriting expert, (3) that no one outside the focus of the investigation was consulted about the letter as to its origins or its contents, and (4) that no other experts, such as a polygraph examiner, were used to determine the identity of the author. We note that Sergeant Aldan and the Attorney General's Office had the entire forensic capabilities of the Federal Bureau of Investigation's Crime Lab at their disposal, but did nothing to avail themselves of its assistance.

Sergeant Aldan explained that this course of action resulted from the decision made by the Attorney General's Office to take no investigative action with respect to the letter:

Q. (By counsel for Mario Reyes) Now Officer, did ... did you ever ask or request, since you're the agent of this case, did you ever ask Officer Claudio Norita regarding possible use of experts to test who the author of that letter is?

A. (By Sergeant Aldan) This is how our cases work. When we forward cases to the Attorney General's Office, they make the decisions. When we still have the case we decide on it. When we forward it to them, they decide it. In this case, I

brought the letter to Mr. Hammett. He told me to hold on to it until he needs it.

## THE LAW

Few things are more repugnant to the constitutional expectations of our criminal justice system than covert perjury, and especially perjury that flows from a concerted effort by rewarded criminals to frame a defendant. The ultimate mission of the system upon which we rely to protect the liberty of the accused as well as the welfare of society is to ascertain the factual truth, and to do so in a manner that comports with due process of law as defined by our Constitution. This important mission is utterly derailed by unchecked lying witnesses, and by any law enforcement officer or prosecutor who finds it tactically advantageous to turn a blind eye to the manifest potential for malevolent disinformation. *See United States v. Wallach*, 935 F.2d 445 (2nd Cir.1991) ("Indeed, if it is established that the government knowingly permitted the introduction of false testimony 'reversal is virtually automatic.'") (citations omitted); *Cf. Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) ("[I]t would be an unthinkable imposition upon [the authority of a magistrate judge] if a warrant affidavit, revealed after the fact to contain a deliberately or recklessly false statement, were to stand beyond impeachment.").

Because of the gravity of depriving a person of liberty on the basis of false testimony, the Supreme Court and the United States Courts of Appeal have fashioned over the years a workable set of precise rules designed not only to remedy egregious wrongs that have already occurred, but also prophylactically to prevent damaging false testimony from happening in the first place.[1] In *Mooney v. Holohan*,

---

1. For example, Ninth Circuit Criminal Jury Instruction 4.10 (2000), reads as follows:

   You have heard testimony that [*witness*], a witness has received [benefits, compensation, favored treatment, *etc.*] from the government in connection with this case. You should examine [*witness*] testimony with greater caution than that of other witnesses. In evaluating that testimony, you should consider the extent to which it may have been influenced by the receipt of [*e.g.*, benefits] from the government.

294 U.S. 103, 104, 55 S.Ct. 340, 79 L.Ed. 791 (1935), for example, petitioner Mooney alleged that "the sole basis of his conviction was perjured testimony, which was knowingly used by prosecuting authorities in order to obtain that conviction...." He argued to the Court that the conscious use by the state of perjured testimony and the deliberate suppression of evidence to impeach that testimony constituted a denial of due process of law. *Id.* The Attorney General of California, on behalf of Warden Holohan of San Quentin Penitentiary, argued in response that "it is only where an act or omission operates so as to deprive a defendant of notice or so as to deprive him of an opportunity to present such evidence as he has, that it can be said that due process of law has been denied." *Id.* at 112, 55 S.Ct. 340.

The Court rejected this cramped view of the guarantee, saying that due process:

> cannot be deemed to be satisfied by mere notice and hearing if a state has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured. Such a contrivance by a state to procure the conviction and imprisonment of a defendant is inconsistent with the rudimentary demands of justice.... And the action of prosecuting officers on behalf of the state ... may constitute state action within the purview of the Fourteenth Amendment.

*Id.* at 112–13, 55 S.Ct. 340.

Seven years later, in *Pyle v. Kansas,* 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214 (1942), the Court emphasized this theme:

> Petitioner's papers are inexpertly drawn, but they do set forth allegations that his imprisonment resulted from perjured testimony, knowingly used by the State authorities to obtain his conviction, and from the deliberate suppression by those same authorities of evidence favorable to him. These allegations sufficiently charge a deprivation of rights guaranteed by the Federal Constitution, and, if proven, would entitle petitioner to release from his present custody.

*Id.* at 215–16, 63 S.Ct. 177.

In *Alcorta v. Texas,* 355 U.S. 28, 78 S.Ct. 103, 2 L.Ed.2d 9 (1957), the Court was confronted with a prosecutor who on direct examination knowingly allowed a witness to create a false impression of his disputed relationship with the defendant's murdered wife. The witness told the prosecutor before trial that he had had sexual intercourse with the wife on five or six occasions, which, if true, would have corroborated the defendant's mitigating version of the reason why he stabbed and killed her. The prosecutor told the witness not to volunteer any information about the sexual aspect of his relationship with the decedent, and then sat quietly by while his witness lied under oath, claiming that his relationship with the defendant's wife was just a "casual friendship." Influenced by the false testimony, the jurors rejected Alcorta's bid for a manslaughter conviction and found him guilty of capital murder. In granting Alcorta's petition for a writ of habeas corpus, the court held that the false impression given to the jury by the prosecutor and the State violated his right to due process. *Alcorta,* 355 U.S. at 31, 78 S.Ct. 103.

In *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), Chief Justice Warren reinforced this constitutional imperative. He quoted from a New York Court of Appeals case involving false testimony from a witness who had been given substantial consideration for his testimony:

> A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, *the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth.*

*Id.* at 269–70, 79 S.Ct. 1173 (quoting *People v. Savvides,* 1 N.Y.2d 554, 557, 154 N.Y.S.2d 885, 136 N.E.2d 853, 854–855 (N.Y.Ct.App.1956) (holding that where wit-

ness for the prosecution falsely testified that there was no agreement that he was to receive lenient treatment for testifying against defendant, Assistant District Attorney should have exposed the lie of the witness)) (emphasis added).

In 1976, the Court was called on yet again to visit this recurring issue, noting that it "has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). The Court observed that the *Mooney* line of cases applied this strict standard "not just because they involve prosecutorial misconduct, but more importantly because they involve a corruption of the truth-seeking function of the trial process." *Id.*

Running parallel to this line of authority is a related series of cases casting light on the responsibility of prosecutors exercising the executive power of the state. The seminal case in this line is *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), the message of which we summarized in *Commonwealth of The Northern Mariana Islands v. Mendiola*, 976 F.2d 475 (9th Cir.1992) (overruled on other grounds in *George v. Camacho*, 119 F.3d 1393 (9th Cir.1997)) [2]:

> The prosecuting attorney represents a sovereign whose obligation is to govern impartially and whose interest in a particular case is not necessarily to win, but to do justice. It is the sworn duty of the prosecutor to assure that the defendant has a fair and impartial trial.

*Id.* at 486 (internal citation omitted). *See also United States v. LaPage*, 231 F.3d 488, 492 (9th Cir.2000) ("A prosecutor has a special duty commensurate with a prose-

cutor's unique power, to assure that defendants receive fair trials.")

In *Nix v. Whiteside*, 475 U.S. 157, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986), a case in which a defense attorney balked at his client's insistence on committing perjury, the Supreme Court amplified the dimensions of every lawyer's duty to prevent fraud upon a court. In upholding the attorney's ethical decision against his client's claim that the attorney's conduct violated his Sixth Amendment right to effective representation of counsel, the Court articulated standards found in the Canons of Professional Ethics of the American Bar Association and the Model Code of Professional Responsibility, in stating:

> These standards confirm that the legal profession has accepted that an attorney's ethical duty to advance the interests of his client is limited by an equally solemn duty to comply with the law and standards of professional conduct; it specifically ensures that the client may not use false evidence. This special *duty of an attorney to prevent and disclose frauds* upon the court derives from the recognition that perjury is as much a crime as tampering with witnesses or jurors by way of promises and threats, and undermines the administration of justice.

*Id.* at 168–69, 106 S.Ct. 988 (emphasis added).

Following these cases, we observed in 1993 that a "prosecutor who does not appreciate the perils of using rewarded criminals as witnesses risks compromising the truth-seeking mission of our criminal justice system," and we indicated that "we expect prosecutors and investigators to take all reasonable measures to safeguard the system against treachery." *United States v. Bernal–Obeso*, 989 F.2d 331, 333 (9th Cir.1993).

---

**2.** This, of course, was not the first time that we published Justice Sutherland's message. *See Sheppard v. Rees*, 909 F.2d 1234, 1238 (9th Cir.1989); *United States v. Krasn*, 614

F.2d 1229, 1234 n. 5 (9th Cir.1980); *United States v. Anguloa*, 598 F.2d 1182, 1184 (9th Cir.1979).

Finally, we come to the rule that "a bad faith failure to collect potentially exculpatory evidence would violate the due process clause." *Miller v. Vasquez,* 868 F.2d 1116, 1120 (9th Cir.1989). Relying on *Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), we made it abundantly clear that due process requires law enforcement not just to preserve evidence already in hand, but to gather and to collect evidence in "those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." *Miller,* 868 F.2d at 1121 (citing *Youngblood,* 488 U.S. at 58, 109 S.Ct. 333). *Cf. Kyles v. Whitley,* 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (an individual prosecutor has "a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.").

## ANALYSIS

■ When measured by the controlling rules and standards articulated by the Supreme Court to explicate the special duties and responsibilities (1) of a prosecutor to see that justice is done and to guard against due process violations caused by false testimony, and (2) of law enforcement to collect potentially exonerating evidence, the Attorney General's conduct when confronted with Mario Reyes's letter fails on all counts. The plain language in the letter would alert anyone—and certainly a prosecutor in charge of the Attorney General's Criminal Division—to the strong possibility that the witnesses in this case had agreed to testify falsely against Bowie in order to extract the writer of the letter from the center of blame for Laude's death. The author of this letter was argu-

ably Mario Reyes, although it certainly might have been his brother Efrain, soon to become a prosecution witness.[3] Given this record, it was not likely that the letter was written by J.J. Bowie. In any event, the letter says clearly that (1) "Im the one that did this," (2) "theyre gonna put me in jail for life," (3) "just imagine four against one," (4) "I tried this before," and (5) "I even lied to my lawyer about the incedent." Moreover, the writer acknowledges that he has already set in motion with John, Brasslley and Lucas a plan to say that the defendant Bowie killed "the philipino," and that the detectives should *not* be told "that Im the one that did this things."

Faced with this information, the prosecutor's clear duty under our Constitution was to do exactly the opposite of what he did. The law in place when the letter was found on November 17, 1992, left no room for doubt that the immediate constitutional obligation of the State and its representatives to collect potentially exculpatory evidence, to prevent fraud upon the court, and to elicit the truth was promptly to investigate the letter and to interrogate their witnesses about it. Let us be clear about this: The prosecutor's duty to protect the criminal justice system was not discharged in this case simply by ignoring the content of the letter and by turning it over to the defense, especially in the light of a scheduled joint trial where one defendant, Bowie, was certain to attempt to use it as evidence against his co-defendant, Mario Reyes. Failing to do anything about the content of this letter was at least the equivalent of knowingly sitting quietly by while a person called as your witness lies on the stand. A prosecutor's "respon-

3. Counsel for Mario Reyes maintained throughout the trial that the letter was not written by his client. In fact, he introduced testimony from another Reyes brother that Efrain Reyes gave him a folded yellow document that appeared to be the letter, and that he then delivered it as requested to Mario Reyes. Moreover, counsel claimed that he had a handwriting expert who was prepared to say that the letter was not written by Mario

Reyes, but the court—at the insistence of Bowie's counsel *and* the prosecutor—refused to admit this evidence because the witness was not on the witness list. We note that as soon as defense counsel mentioned a handwriting expert, the government joined in the motion and requested time to conduct its own examination. The prosecutor's request at this juncture of the trial gives new meaning to the phrase, "too little, too late."

sibility and duty to correct what he knows to be false and elicit the truth," *Napue,* 360 U.S. at 269–70, 79 S.Ct. 1173, requires a prosecutor to act when put on notice of the real possibility of false testimony. This duty is not discharged by attempting to finesse the problem by pressing ahead without a diligent and a good faith attempt to resolve it. A prosecutor cannot avoid this obligation by refusing to search for the truth and remaining willfully ignorant of the facts.[4]

During oral argument, and in its brief, the Attorney General's Office suggested that they would have been hampered from talking to the witnesses by "the right against self-incrimination," a rationale echoed by Sergeant Aldan in his testimony. This is utter nonsense. These accomplice witnesses were cooperating with the government under agreements negotiated, prepared, and signed by Mr. Hammett. These plea agreements required John, Lucas, Brasslley, and Efrain to cooperate or forfeit their deals. We note that John signed his plea agreement on November 11, 1992, six days before Sergeant San Nicolas recovered the letter. John's plea agreement contained this language, which we find also in each of the plea agreements in this case:

> John C. Villagomez agrees to provide truthful and accurate testimony at all times and to fully cooperate and make himself available in the further investigation and preparation of this case(s) for hearing and trial arising out of the kidnapping of Eladio Laude and Nilo Rivera, and the murder of Eladio Laude.

> John C. Villagomez agrees to provide truthful and accurate testimony at all hearings or trial at the times requested by the prosecution, including but not limited to any re-trials.

> It is expressly understood that the giving of false information or false testimony by John C. Villagomez will be considered a failure to fully cooperate and a violation of the provisions of this agreement.

What appears clearly from this record is a studied decision by the prosecution not to rock the boat, but instead to press forward with testimony that was possibly false on the apparent premise that all these accomplices were actually responsible for Laude's murder; and not to develop any evidence or information that would either hurt their case or damage the credibility of their conniving witnesses. To argue as justification for doing nothing, as the Attorney General has done in his brief, that "the witnesses were subject to full cross-examination concerning the letter," and that "there is little that a police interview not under oath could accomplish that could not be accomplished in sworn testimony," misapprehends the free standing constitutional duty of the State and its representatives to protect the system against false testimony. Without a doubt, the record in this case establishes bad faith as a matter of law on the part of the Attorney General's Office in refusing to investigate the potentially exonerating evidence that its own witnesses were conspiring to commit perjury. What emerges from this record is an intent to secure a

4. We note that it is not always improper for a prosecutor or a lawyer to call to the stand a recalcitrant witness whose testimony in some respects will not be truthful, but that it must be made clear to the court and to defense that such an event is occurring, and why. We have in mind as one example, of course, the situation that occurs when a witness makes a pretrial statement that would appear to be truthful, but then discards that truthful position in contemplation of an appearance in court, or for any other reason. Federal Rule of Evidence § 801(d) contemplates such an

eventuality in connection with prior inconsistent statements of a "turncoat witness." The constitutionality of the admission of such evidence as substantive evidence of guilt was determined in *California v. Green,* 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). *See also People v. Gordon,* 10 Cal.3d 460, 471–72, 110 Cal.Rptr. 906, 516 P.2d 298 (Cal. 1973) (holding that a prosecutor's statement to the jury that his own witness was not going to tell the truth satisfied the reason for the rule on admonition with respect to accomplice testimony).

conviction of murder even at the cost of condoning perjury. This record emits clear overtones of the Machiavellian maxim: "the end justifies the means," an idea that is plainly incompatible with our constitutional concept of ordered liberty. *See Rochin v. California,* 342 U.S. 165, 169, 72 S.Ct. 205, 96 L.Ed. 183 (1952).

This letter required a prompt pre-trial investigation at the time it came to light for yet another obvious reason. Not only did it forecast imminent perjury and a material fraud upon the trial court, but had the conspiracy delivered on its perverse objective, the victim of it—J.J. Bowie—might have been effectively deprived of the right to call as witnesses John, Brasslley, and Lucas on his own behalf to establish that it was either Mario or Efrain who was the person who, as the letter says, "did this." In this respect, the content of the letter implicated defendant Bowie's constitutional right under the Sixth Amendment to "obtain witnesses in his favor," because by agreeing to a false story and having used that story to bargain for leniency, the conspirators had deprived Bowie of his right to defend himself.

Moreover, the letter itself was concrete, prima facie evidence of new crimes. One can only wonder at the Attorney General's refusal to do anything about them, especially when the integrity of the formal felony charges they had filed in court was at stake.

Furthermore, the letter suggests that the author had "tried this before." Bowie's defense introduced evidence in this trial that Mario Reyes had indeed turned witness for the Commonwealth in two previous murder cases and implicated others in the deaths of the victims. One would hope that the Attorney General would have looked into the possibility that other persons had been convicted on the basis of rigged testimony concocted by Mario Reyes.

Once the trial judge became immersed in this case, he immediately recognized the import of the letter as well as the patent failures on the part of the Attorney General's Office:

COURT: I know you didn't handle this criminal case Mr. Rotbart. You were drafted, the way I look at the file. I think somebody initially handled left the office. But why didn't the AG's office ask for samples during way ... way back then? I mean wouldn't you have done it as a prosecutor? This is an evidence that would either convict Reyes, would have exculpated Bowie. I'd be very concerned as a prosecutor. I want to make sure before I bring any of them to court. So you don't know anything. I know, I looked into the file, you came in very late into the picture.

MR. ROTBART: Yes your Honor, I had many questions about how the file was handed, myself.

COURT: Even like one of the cross examinations. That evidence exists in the AG's file. There was never a confrontation about the allegation of conspiracy to Lucas, John, Bruce Lee and the defendant, himself. Defendant Reyes, himself. I think one of the answer to that question from the officer was that they have lawyers. They can come to court and ask the court for the defendant to produce sampler. Just like drawing their blood, or take out their hair. That was not done. Then the government wrap up a negotiated plea with three participants of the crime. Three or four participants of a crime. At least a polygraph examination. I mean you've got all of this. You've got this possible evidence. You've got the statements of the four. Then you've got ... then let us say that if I don't admit this piece of evidence [at Bowie's request], I have no question my mind. Somebody's going to be reversed. Talk-

ing about material evidence, the defense ... this is it.

When one reads the trial transcript of this case and examines the full record, including the witnesses' initial statements to the police, one finds many inconsistencies and convenient failures of recollection on the part of the government's accomplice witnesses, who no doubt were the keys to its case. For example, Lucas admitted under close questioning by Bowie's attorney that he had lied to the police about Mario's involvement in the beatings inflicted upon the victims prior to Laude's death:

Q. (By Mr. Long) Okay. But the part that you said about Mario Reyes who was watching the beating take place with you inside the house was not true, correct?

A. (By Lucas) Yes.

Q. Why were you trying to conceal Mario Reyes' involvement?

A. What is that?

Q. Why did you tell the police that Mario Reyes was watching the beating and was not involved in it on November six nineteen ninety two?

A. I was lying.

Q. Why?

A. I am afraid.

. . .

Q. But the point is you knew what to say when it came to Jay Jay [Bowie], correct?

A. What about what, what was I gonna say?

Q. I mean you said about Jay Jay striking the Filipino with the van, correct?

A. Yes

Q. What why could you not say anything about Mr. Mario Reyes's involvement in this incident?

A. I don't know.

These answers, of course, lend credence to the implications of the letter that Lucas would lie to protect Mario and put the blame on Bowie.

Moreover, the record is full of evidence that fails to corroborate the accomplices' story. For example, a forensic examination by the FBI Crime Laboratory failed to link Laude's body and clothing to any of the evidence recovered by the investigators from the undercarriage of the Toyota van. In addition, the coroner Dr. Hanan's testimony was consistent with defendant Bowie's theory that Laude was not killed where his body was found, but elsewhere and then dumped. To complicate the prosecution's case even more, Dr. Hanan did not ascribe the cause of Laude's death to having been struck and dragged by a motor vehicle, but primarily to shock from internal injuries consistent with a beating.

We cannot help but be struck by the prosecution's wily treatment of the letter during trial. When Bowie's counsel was having difficulty convincing the trial judge that it had been sufficiently authenticated to be admitted in evidence, the prosecution helped the defendant by arguing that a sufficient foundation had indeed been established. Then, when Reyes's counsel tried to introduce handwriting evidence that Mario did not write the letter, the government strenuously objected and suddenly became interested in taking time out from the trial to conduct a handwriting examination of its own. This objection was a transparent tactical move to block Reyes from defending against the letter by showing that he did not write it. At any time the prosecution could have asked for handwriting analysis, but to this day has not done so.[5] The glaring lack of integrity

5. Requests by the prosecution for handwriting and fingerprint evidence from a defendant or a suspect are not prohibited by the Fifth Amendment right against self-incrimination because such evidence is not testimonial in nature. *Gilbert v. California,* 388 U.S. 263, 266–67, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967) (finding that the taking of a handwrit-

of the government's position was compounded during final argument when it suggested that Reyes wasn't necessarily the author of the letter. This strikes us in the aggregate as playing fast and loose with the evidence, and not attending to its implications with the seriousness demanded by the Constitution. The government clearly was satisfied with no dispositive evidence as to (1) who wrote the letter, (2) why it was written, or (3) whether prosecution witnesses had conspired to lie under oath, notwithstanding the unmistakable implications of fraud upon the court. The prosecutor at one part in closing argument insinuated that J.J. Bowie himself could have written the letter, and that the plot described in the letter was not to frame J.J., but for the witnesses to tell the truth about him, and merely to leave out the truth about Mario:

> [Prosecutor] Lastly, I'd like to address the letter of Mario that was found in Mario Reyes' cell. Much has been (unintelligible) back and forth about who wrote the letter, where it was found, what it means, et cetera—et cetera. Now, Mr. Long takes a position that of course everybody agreed to blame the crime on—on—on J.J.—on Joseph Bowie, therefore, it must be true and he never did any of these. But another very simple reading of that letter is Mario just doesn't want anybody to say he [Mario] did any of these. Just blame it on J.J., don't say I [Mario] did any of these. Leave me out of it. Just say J.J. was driving. Tell the police that maybe I stayed home. Now that's a very basic look of this letter and this letter is much more problematic than that it—it—it really opens up a can of worms. Why would somebody incarcerated in prison as Mario Reyes' says, write a letter saying I murdered a Filipino. Put that down in writing and then send it to ostensibly send it to Efrain Reyes who has already talked to the police. Why would you do that? Don't you think there's a chance that maybe Efrain Reyes who's already spoke with the police and basically gave in a full statement is gonna say, hey man, give me a better deal. Look what I got from my brother. He says, he murdered them. And conveniently that letter contains references to everybody else. It contains references to Bruce, Broce Lee—Bruce Lee, John, Lucas, all of them have agreed to blame it on J.J. Now, I guess if you just throw the letter up and you say, well it must have been somebody who is participating in the crime. Who do we have left? Well, it's November 17th. Efrain's already given a statement so it's kind of weird for him to write a letter saying, you know what, lie to the cops because well I already gave them a full statement that says what I did and what you did and what J.J. did but lie to them anyways because then I'll get away with these. It makes no sense. Efrain wouldn't do that, neither would John, neither would Bruce, neither would Lucas. So we're left with Mario and J.J. as possible authors of this letter.

Thus, according to the prosecution, the letter convicts *both* defendants even though in a separate trial against Bowie, it would most probably *not* be admissible for this purpose if written by Mario because it would be rank hearsay.

We are struck also by the utter shambles made of this case by the government's insistence on a joint trial knowing full well that Bowie could not fail to introduce this letter in an attempt to exculpate himself by fingering his co-defendant. This ploy

ing exemplar in absence of counsel does not deny a defendant of his Fifth or Sixth Amendment rights); *United States v. Mara,* 410 U.S. 19, 21, 93 S.Ct. 774, 35 L.Ed.2d 99 (1973) ("Handwriting, like speech, is repeatedly shown to the public, and there is no more expectation of privacy in the physical charac- teristics of a person's script than there is in the tone of his voice."); *United States v. Thomann,* 609 F.2d 560, 562 (1st Cir.1979) ("Fingerprint evidence does not fall within the fifth amendment's privilege against self-incrimination.").

allowed the prosecution indirectly to use the uninvestigated letter against Mario Reyes without having to authenticate it and to introduce it themselves, and without having to risk further challenge and damage to the credibility of their own accomplice witnesses. The injection of the damning letter at the insistence of the defense allowed Bowie's counsel to introduce evidence of Mario Reyes's possible responsibility for two other homicides and for framing innocent people in those cases. Mario Reyes ended up being prosecuted not only by the Attorney General's Office, but also by Bowie's attorney. We highlight this result because it underscores the need in the interest of due process for the *government* to do its best to sort out these complications before they go to court. The trial judge recognized this problem and even went so far as to muse that he might get fired—or have to fire himself—should he follow his instinct and declare a mistrial and start over. We have no doubt at all that this letter affected the jury's judgment.

We must acknowledge, however, an unusual aspect of this case. It was Bowie, not the government, who introduced this letter into the trial, and it was Bowie who fought against his co-defendant Reyes's belated attempt to establish through handwriting analysis evidence that Reyes was not the author. The letter, in fact, was the main focus of Bowie's defense and was used continuously by him to deflect blame from himself and onto Mario Reyes. We are left after reading this record—including every word uttered in the courtroom—with the impression that the last thing Bowie wanted was an investigation of the source of this letter. Bowie's attorney clearly and understandably believed that as it stood, the inference that Mario was its author weighed heavily in his favor during the joint trial. Therefore, if the issue in this case raised by Bowie on appeal had stemmed only from the use of the letter in court as evidence, we would hold without hesitation that he waived that issue by (1) having not objected to its admis-

sion into evidence, and (2) having introduced it himself on his own behalf.

The issue Bowie presents on appeal, however, is vastly different. The issue is not just whether the use of the letter during the trial somehow deprived Bowie of due process of law, but whether the government's inexcusable lack of attention to and investigation of the letter deprived Bowie of liberty without due process of law, notwithstanding Bowie's forced use of it at trial on his own behalf. Had the government discharged its duty prior to trial and established that Mario Reyes was the author of the letter, Bowie's use of it in defense of himself would have been enhanced. On the other hand, if Efrain Reyes turned out to be the author, Bowie's hand would also have been strengthened, and at least one—if not all—of the government's witnesses would have lost a substantial measure of their credibility.

What may have served Bowie's purposes in trial is different and distinct from the duty of the prosecution to protect the trial process against fraud. Viewed in this light, what Bowie did in court with the letter is irrelevant. He had certain constitutional rights that he could waive or forfeit, but he could not waive the freestanding ethical and constitutional obligation of the prosecutor as a representative of the government to protect the integrity of the court and the criminal justice system, as established in *Mooney* and *Berger*. *Cf. Harrison v. United States,* 392 U.S. 219, 224, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968) (a defendant's testimony impelled by the prosecution's use of an illegal confession does not waive the defendant's right to object to the use of that testimony against him in a subsequent trial). To quote again from *Mendiola,* "It is the sworn duty of the prosecutor to assure that the defendant has a fair and impartial trial." *Mendiola,* 976 F.2d at 486. Here, the government shirked this duty. In this respect, the error on which we reverse Bowie's conviction was not simply a trial error, but a fatal due process error committed by the

Office of the Attorney General of the Commonwealth of the Northern Mariana Islands. The error fatally contaminated everything that followed.

The Attorney General argues that without actual proof of perjury in the record as it now stands, it is premature to order a new trial. The Attorney General asks us to remand this matter to the trial court for a full evidentiary hearing to determine whether any of the witnesses actually lied as suggested by the letter. As support for this position, the Attorney General notes that in the controlling cases, the record justified the conclusion that perjury did in fact infect the trial and result in a denial of due process. The Attorney General's argument misses the mark in this case.

First, we cannot help but note the irony in an argument that asks years after a trial for an opportunity to do what the Constitution required of the proponent of the argument *before* the trial began to ensure that it would be fair. It is the Attorney General who is directly responsible for what he now says is unclear from the record and for the deficiencies in the trial that took place. Given the manifest reason to question the veracity of the prosecution's witnesses, the Constitution required a prompt pretrial investigation of the integrity of the government's evidence before the witnesses were called to the stand. This requirement is not satisfied by a tardy evidentiary hearing after the fact. Although the prosecution had leverage before the trial to get to the truth with its witnesses, it is not unlikely now that the Fifth Amendment will shield them from the inquiry the prosecution wishes to launch. By committing the witness under oath to a certain story, an admission now of untruthfulness might well unveil a crime.

Second, when Reyes's counsel attempted to introduce handwriting evidence to establish that Reyes did not write the letter, the Attorney General's representative objected and blocked evidence on a crucial part of the issue it now says it wants to examine.

Third, the record as it stands establishes bad faith with regard to this issue on the part of the Attorney General's Office prior to and during the trial, i.e., a knowing violation of its ethical obligations.

In conclusion, the clear defects in Bowie's trial were the direct result of the prosecutor's pretrial constitutional failure to guard against improbity in the trial process, a failure which rendered the trial itself patently unfair in due process terms. The prosecution saw fit without prophylaxis to call to the stand witnesses whom it had clear reason to believe might have conspired to lie under oath. The manner in which the trial unfolded leaves us with the definite conviction that the process itself lacked fundamental fairness and delivered a palpably unreliable result. In this connection, the principles which compel our decision here are not designed to punish society for the misdeeds of a prosecutor, *see United States v. Agurs*, 427 U.S. 97, 110 n. 17, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), but to vindicate the accused's constitutional right to a fair trial, a fundamental right for which the prosecution shares responsibility with the courts.

## CONCLUSION

Never has it been more true than it is now that a criminal charged with a serious crime understands that a fast and easy way out of trouble with the law is not only to have the best lawyer money can buy or the court can appoint, but to cut a deal at someone else's expense and to purchase leniency from the government by offering testimony in return for immunity, or in return for reduced incarceration. Our system long ago recognized and embraced this kind of favoritism because, given our strict and demanding constitutional mandates and rules of evidence, not to do so would insulate many vile and dangerous outlaws from the reach of the law. Without accomplice cooperation and testimony, many killers, terrorists, rapists, swindlers, white collar and corporate criminals, corrupt public officials, and others would have

escaped their just fates. A well construct-ed and carefully managed deal can make a significant contribution to the rule of law, and to justice.

On the other hand, because of the per-verse and mercurial nature of the devils with whom the criminal justice system has chosen to deal, each contract for testimony is fraught with the real peril that the proffered testimony will not be truthful, but simply factually contrived to "get" a target of sufficient interest to induce con-cessions from the government. Defen-dants or suspects with nothing to sell sometimes embark on a methodical jour-ney to manufacture evidence and to create something of value, setting up and betray-ing friends, relatives, and cellmates alike. Frequently, and because they are aware of the low value of their credibility, criminals will even go so far as to create corrobora-tion for their lies by recruiting others into the plot, a circumstance we appear to con-front in this case.[6]

Such false testimony and false evidence corrupts the criminal justice system and makes a mockery out of its constitutional goals and objectives. Thus, although the truthful testimony of accomplice witnesses will continue to be of great value to the law, rewarded criminals also represent a great threat to the mission of the criminal justice system. It is just as constitutional-ly unacceptable for the government to put a guilty person in prison on the basis of false evidence as it is to have an innocent person suffer the same fate.

The authentic majesty in our Constitu-tion derives in large measure from the rule of law—principle and process instead of person. Conceived in the shadow of an abusive and unanswerable tyrant who re-jected all authority save his own, our an-cestors wisely birthed a government not of leaders, but of servants of the law. Nowhere in the Constitution or in the Declaration of Independence, nor for that matter in the Federalist or in any other writing of the Founding Fathers, can one find a single utterance that could justify a decision by any oath-beholden servant of the law to look the other way when con-fronted by the real possibility of being complicit in the wrongful use of false evi-dence to secure a conviction in court. When the Preamble of the Constitution consecrates the mission of our Republic in part to the pursuit of Justice, it does not contemplate that the power of the state thereby created could be used improperly to abuse its citizens, whether or not they appear factually guilty of offenses against the public welfare. It is for these reasons that Justice George Sutherland correctly said in *Berger* that the prosecution is not the representative of an ordinary party to a lawsuit, but of a sovereign with a re-sponsibility not just to win, but to see that justice be done. 295 U.S. at 88, 55 S.Ct. 629. Hard blows, yes, foul blows no. The wise observation of Justice Louis Brandeis bears repeating in this context:

> "In a government of laws, existence of the government will be imperiled if it fails to observe the law scrupulously. Our government is the potent, the omni-present teacher. For good or for ill, it teaches the whole people by its exam-ple.... If the government becomes a lawbreaker, it breeds contempt for the law; it invites every man to become a law unto himself."

*Olmstead v. United States,* 277 U.S. 438, 485, 48 S.Ct. 564, 72 L.Ed. 944 (1928).

The ends in our system do *not* justify the means. Our Constitution does not promise every criminal will go to jail, it promises due process of law. It is regret-table that the final day of judgment for those who killed Laude and kidnaped Riv-era has not yet arrived, but as Justice Oliver Wendell Holmes put it, "It is a less evil that some criminals should escape

---

**6.** A recent study conducted by the Actual In-nocence Project revealed that out of sixty-two cases in which DNA has exonerated an inno-cent defendant, thirteen cases, or twenty-one percent, relied to some extent on the testimo-ny of informers. Barry Scheck, Peter Neu-feld, & Jim Dwyer, *Actual Innocence* (2000).

than that the government should play an ignoble role." *Id.* at 469, 48 S.Ct. 564 (Holmes, J., dissenting). It is for this reason that the law places the duty to manage this difficult business with the utmost care upon those in the best position and with the power to ensure that it does not go awry. Although the public has an interest in effective law enforcement, and although we expect law enforcement officers and prosecutors to be tough on crime and criminals, we do not expect them to be tough on the Constitution. As Justice Clark remarked in *Mapp v. Ohio,* 367 U.S. 643, 659, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), "Nothing can destroy a government more quickly than its failure to observe its own laws, or worse, its disregard of the charter of its own existence."

These duties imposed on police and prosecutors by the requirements of due process are hardly novel or burdensome. Investigating and verifying the credibility of witnesses and the believability of testimony and evidence is a task which they undertake every day in the regular discharge of their ordinary responsibilities, and we cannot conceive of any fair-minded prosecutor chaffing under these mandates. All due process demands here is that a prosecutor guard against the corruption of the system caused by fraud on the court by taking whatever action is reasonably appropriate given the circumstances of each case. The Attorney General's faulty decision and calculated course of non-action in this case deprived Bowie of the fair process that was his due under our Constitution before he could be deprived of his liberty.

REVERSED and REMANDED for a new trial.