IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Personal Restraint Petition of<br><br>CJ COPELAND,<br><br>               Petitioner. | No. 80973-3-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

SMITH, J. — A jury found CJ Copeland guilty of three counts of second degree assault and two counts of third degree assault. In this personal restraint petition (PRP), Copeland requests a reference hearing to establish that the prosecutor violated his right to due process by presenting false testimony at trial and allowing it to go uncorrected. He also contends that he received ineffective assistance of counsel. Because Copeland fails to allege facts that would entitle him to relief, we deny his request for a reference hearing and deny the personal restraint petition.

FACTS

The facts underlying this conviction are set out in more detail in State v. Copeland, No. 76372-5-I (Wash. Ct. App. July 30, 2018) (unpublished), https://www.courts.wa.gov/opinions/pdf/763725.pdf.

> Jill Cutler and Brian Hagins were married for 23 years, and have four children: Hailey, Niam, Brona, and T.H. Cutler and Hagins were active members of the Mormon Church. Hagins worked outside the home and Cutler was a homemaker.
> In 2011, Cutler's best friend McKala Copeland passed away unexpectedly. In 2012, Cutler and Hagins agreed to take in her

Citations and pin cites are based on the Westlaw online version of the cited material.

> children CJ Copeland and Alex Hunter until they could get back on their feet.  CJ Copeland was 18 years old and Alex Hunter was 15 years old.
>
> At the time Copeland and his brother moved in, Cutler and Hagins' marriage was already falling apart.  In May 2013, Cutler secretly began a sexual relationship with Copeland.
>
> …
>
> According to Cutler, Copeland started physically abusing her within weeks after they began their sexual relationship.  He was also extremely controlling and paranoid that she was cheating on him.  He made her ask permission to go to the store or even to get out of bed or go to the bathroom.  He imposed strict time limits on her outings and forced her to text him photos to prove she wasn't cheating.  If she did not answer his calls on the first ring, he would accuse her of cheating.  He constantly checked her cell phone to make sure she was not talking to men or deleting texts or emails.  He told Cutler that if she left him or had him arrested, his friends would rob her and burn her house down.  He also threatened to have Cutler or her children put in jail.

Copeland, slip op. at 1-3.  In October 2015, Cutler allowed a friend to call the police, and after speaking with Cutler and seeing bruises all over her body, the police arrested Copeland.  The State charged Copeland with five counts of second degree assault and two counts of third degree assault.

Cutler was the only direct witness to the abuse and testified at length at trial.  In addition to her testimony, three of Cutler's children testified about seeing their mother with bruises, black eyes, and broken noses on multiple occasions.  Two of Cutler's friends testified that Cutler had told them that Copeland was abusing her.  The State introduced photos of extensive bruising and burn marks on Cutler—some were taken by the police on the day Copeland was arrested, and others were provided by Cutler, who said she had taken them throughout the relationship and e-mailed them to a secret e-mail address before deleting them

from her phone. There were also photos of marks on Cutler's bedframe and bedroom walls consistent with belt strikes.

The jury found Copeland guilty of both counts of third degree assault and three of the five counts of second degree assault. The court sentenced Copeland to 70 months of incarceration. Copeland appealed, challenging the admission of Cutler's friends' testimony about Cutler's prior statements, and we affirmed.

## ANALYSIS

In his PRP, Copeland contends that the prosecutor failed to ensure the accuracy of the testimony it presented at trial and thereby violated his due process right to a fair trial. He also contends that he received ineffective assistance of counsel because his trial counsel failed to adequately investigate the case or to raise the issue of contradictory testimony at various points throughout trial. We conclude that Copeland has not met his burden to allege facts that would entitle him to relief.

A petitioner may seek relief from governmental restraint where "[t]he conviction was obtained or the sentence . . . was imposed . . . in violation of the Constitution of the United States or the Constitution or laws of the State of Washington." RAP 16.4(c)(2). "Relief by way of a collateral challenge to a conviction is extraordinary, and the petitioner must meet a high standard before this court will disturb an otherwise settled judgment." In re Pers. Restraint of Coats, 173 Wn.2d 123, 132, 267 P.3d 324 (2011). Accordingly, "personal restraint petitioners who have had prior opportunity for judicial review must show

that they were actually and substantially prejudiced by constitutional error or that their trials suffered from a fundamental defect of a nonconstitutional nature that inherently resulted in a complete miscarriage of justice." Coats, 173 Wn.2d at 132.

> This court has three options regarding constitutional issues raised in a personal restraint petition:
> 1. If a petitioner fails to meet the threshold burden of showing actual prejudice arising from constitutional error, the petition must be dismissed;
> 2. If a petitioner makes at least a prima facie showing of actual prejudice, but the merits of the contentions cannot be determined solely on the record, the court should remand the petition for a full hearing on the merits or for a reference hearing pursuant to RAP 16.11(a) and RAP 16.12;
> 3. If the court is convinced a petitioner has proven actual prejudicial error, the court should grant the Personal Restraint Petition without remanding the cause for further hearing.

In re Pers. Restraint of Rice, 118 Wn.2d 876, 885, 828 P.2d 1086 (1992).

To make the required prima facie showing for a reference hearing, the petitioner must "state in his petition the facts underlying the claim of unlawful restraint and the evidence available to support the factual allegations." Rice, 118 Wn.2d at 885-86. "[T]he petitioner must state with particularity facts which, if proven, would entitle him to relief" and "must present evidence showing that his factual allegations are based on more than speculation, conjecture, or inadmissible hearsay." Rice, 118 Wn.2d at 886. "Once the petitioner makes this threshold showing, the court will then examine the State's response to the petition," which "must answer the allegations of the petition and identify all material disputed questions of fact." Rice, 118 Wn.2d at 886. "If the parties' materials establish the existence of material disputed issues of fact, then the

4

superior court will be directed to hold a reference hearing in order to resolve the factual questions." Rice, 118 Wn.2d at 886-87.

## Presentation of False Testimony

Copeland first contends that the prosecutor violated his due process right to a fair trial by eliciting false testimony. We disagree.

A prosecutor "must function within boundaries" while seeking justice because the prosecutor "owes a duty to defendants to see that their rights to a constitutionally fair trial are not violated." State v. Monday, 171 Wn.2d 667, 676, 257 P.3d 551 (2011). Accordingly, the constitution requires the prosecution to disclose favorable evidence to the defense where the evidence is material to the defendant's guilt or punishment. Brady v. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). Similarly, a prosecutor "may not knowingly use false evidence, including false testimony, to obtain a tainted conviction." Napue v. Illinois, 360 U.S. 264, 269-70, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959) (reversing conviction where prosecutor knowingly presented false testimony that witness had not received any promises of leniency in exchange for testifying). "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." Napue, 360 U.S. at 269. A "'conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" In re Pers. Restraint of Benn, 134 Wn.2d 868, 936, 952 P.2d 116 (1998) (quoting United States v. Agurs, 427 U.S. 97, 103, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976)).

5

Furthermore, "when it should be obvious to the Government that [a] witness' answer, although made in good faith, is untrue, the Government's obligation to correct that statement is as compelling as it is in a situation where the Government knows that the witness is intentionally committing perjury." United States v. Harris, 498 F.2d 1164, 1169 (3d Cir. 1974). "'Mere inconsistency' between witnesses' testimony is not necessarily perjury, and not every contradiction is material." United States v. Martin, 59 F.3d 767, 770 (8th Cir. 1995) (quoting United States v. Nelson, 970 F.2d 439, 443 (8th Cir. 1992)).

Copeland points to several facts that he claims show the prosecutor knew or should have known that Cutler offered false testimony. First, he points to a complaint Cutler made to the police about the police officer's initial response to her call. Cutler had emailed a complaint to the police department saying that the deputy who arrived at her house had not collected evidence, that she thought he did not believe her, and that she had been called a liar. The officer who investigated this complaint testified that she "noted that the deputy had collected evidence and that we had made an arrest that day. And certainly, if we didn't believe a victim, we wouldn't make an arrest." Copeland claims this shows the State knew Cutler "at best, exaggerated and at worst, made false accusations" about the police and that this put the veracity of Cutler's testimony at issue. However, the officer who investigated the complaint concluded that there was simply a difference in perception:

> When I explained that we're going to ask hard questions, it was maybe his approach or questions that maybe made her jump to that conclusion.

6

>    For example, her claim that we didn't collect evidence, I'm thinking that's a discrepancy because I clearly see he collected, took pictures, and he collected a belt or belts.
>    Her assertion would be we didn't collect the knife.
>    So it's a perspective.

The officer also concluded that Cutler's perception was that "she was made to feel she was a liar as opposed to being called a liar." This evidence does not establish that Cutler falsely testified about the issues at trial, or that the prosecutor knowingly presented false testimony. At worst it raises an issue of Cutler's credibility, and issues of credibility are left for the trier of fact to determine. In re Pers. Restraint of Monschke, 160 Wn. App. 479, 498, 251 P.3d 884 (2010). Copeland was properly able to raise this issue and elicit the above testimony during trial. See also State v. Statler, 160 Wn. App. 622, 641-42, 248 P.3d 165 (2011) ("The jury had to determine whether there was perjured testimony, and apparently rejected the defense arguments."). Copeland relies on N. Mariana Islands v. Bowie, 243 F.3d 1109, 1117-18 (9th Cir. 2001), in which the prosecutor proceeded with trial without investigating a letter found in the possession of one of the defendant's accomplices, describing a plan to blame the murder on the defendant despite it having been committed by someone else. None of the facts in this case approach the blatant notice of potential false testimony that was present in Bowie.

Copeland next points to Cutler's statements at his sentencing hearing, including descriptions of sadism and rape by Copeland, that were not part of her testimony at trial. However, Copeland fails to establish a connection between these new allegations and any purportedly false testimony at trial, let alone any

basis on which the prosecutor should have known at trial that it was offering false testimony. Nor do these allegations affect the propriety of his sentence, given the sentencing court's explicit statement that it was not "taking into account factual allegations that may have been made that were unproved."

Copeland next contends that the State's investigation was incomplete with respect to the photographs Cutler provided of her injuries. Cutler testified that she began taking photographs of her injuries in March or April of 2015, and that she would send them to a secret email address and then delete the evidence off of her phone. Cutler printed out these photos and e-mails and gave them to police, who asked if they could look at her phone to try to get the embedded photos from it. Cutler testified that she agreed, but the police did not take her phone immediately, and two weeks later the microphone on her phone broke and when she brought it to the phone store to get it fixed, they gave her a brand new phone. Accordingly, the police were not able to gather forensic evidence from the phone. Again, these circumstances could be and were used to impeach Cutler's credibility, but do not establish that her testimony was false. Indeed, the injuries depicted in Cutler's photos were corroborated by the testimony of multiple witnesses, including police, describing similar bruising and injuries on Cutler's body. Furthermore, while Copeland could properly use these facts to raise doubts about the thoroughness of the police investigation, an "incomplete or perhaps negligently conducted" investigation does not itself establish a violation of due process. State v. Armstrong, 188 Wn.2d 333, 345-46, 394 P.3d 373 (2017).

Copeland also points to other shortcomings in the State's investigation, such as the fact that it did not subpoena Copeland's phone records or follow up on a claim that Cutler made in an interview that Copeland beat her outside on one occasion when the neighbors were outside. These incidents again constitute, at worst, an incomplete investigation rather than suppression of evidence or presentation of false evidence. Copeland was able to present this information to the jury, which was able to judge credibility accordingly. Copeland was also able to impeach Cutler on her earlier statement that the neighbors had been outside, when she conceded that she merely "thought there was a good chance they were out."

Finally, Copeland points to general inconsistencies in Cutler's testimony. These inconsistencies include differences in timelines—Cutler at one point testified that she began documenting her injuries in March or April of 2015 but later testified that she photographed her injuries from an assault on February 18, 2015, a few days after it happened—and in how she described her experiences—for instance, saying at one point that Copeland never let her go to the doctor but at another point describing a visit to her regular doctor. None of these differences within Cutler's testimony point to the prosecutor allowing false testimony to go uncorrected; on the contrary, many of the inconsistencies Copeland describes are at portions where Cutler is correcting herself. "Conflicting witness testimony does not demonstrate that the witnesses committed perjury or that the prosecutor knew of any alleged perjury." Monschke, 160 Wn. App. at 498.

Altogether, the facts cited by Copeland do not establish that Cutler perjured herself or that the prosecutor was on notice that her testimony was false. These facts all go to Cutler's credibility, which was properly put at issue before the jury. Copeland has failed to allege facts showing his due process right was violated.

Ineffective Assistance of Counsel

Copeland also contends that he received ineffective assistance of counsel because his attorney failed to challenge the sufficiency or integrity of the State's evidence by, for instance, challenging the State's probable cause or moving for a mistrial. Copeland also contends that his attorney failed to adequately investigate or interview witnesses. We disagree.

"Those charged with a crime have a constitutional right to effective assistance of counsel." In re Khan, 184 Wn.2d 679, 688, 363 P.3d 577 (2015). A defendant "bears the burden of showing (1) that his counsel's performance fell below an objective standard of reasonableness and, if so, (2) that counsel's poor work prejudiced him." State v. A.N.J., 168 Wn.2d 91, 109, 225 P.3d 956 (2010).

Copeland has failed to allege facts that would entitle him to relief. Because he has failed to show that the State presented false evidence, he has necessarily failed to show that his attorney was ineffective by failing to move for a mistrial on these grounds. Although he provides an affidavit from his trial attorney, there is no information about the scope of her investigation or her decisions regarding how she challenged the State's evidence. A review of the record indicates that Copeland's attorney at trial raised almost all of the

10

evidentiary issues and factual inconsistencies that he discusses in his petition, and the jury was able to weigh them accordingly.  Thus, Copeland has failed to allege facts that indicate his attorney's performance fell below an objective standard of reasonableness or that her performance prejudiced him.

Because Copeland has not met his burden to show that his conviction was entered in violation of the federal constitution or the constitution or laws of Washington State, we deny Copeland's PRP.

_____

WE CONCUR:

_____        _____
Mann, C.J.                                              Dwyer, J.

11