**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MARA PLASCENCIA,
          *Petitioner-Appellant,*

v.

EDWARD S. ALAMEIDA, JR.,
Director, California Department of
Corrections,
          *Respondent-Appellee.*

No. 05-56458

D.C. No.
CV-03-02128-
IEG/WM

OPINION

Appeal from the United States District Court
for the Southern District of California
Irma E. Gonzalez, District Judge, Presiding

Argued and Submitted
June 8, 2006—Pasadena, California

Filed November 3, 2006

Before: Stephen Reinhardt and Stephen S. Trott,
Circuit Judges, and James L. Robart,* District Judge.

Opinion by Judge Trott

*The Honorable James L. Robart, United States District Judge for the Western District of Washington, sitting by designation.

18149

## COUNSEL

Allen R. Bloom, San Diego, California, for the petitioner-appellant.

Marilyn L. George, Deputy Attorney General, San Diego, California, for the respondent-appellee.

## OPINION

TROTT, Circuit Judge:

Petitioner Mara Plascencia appeals the district court's denial of her petition for a writ of habeas corpus. Plascencia

was convicted by a jury in state court of the murder of Teresa Silva and sentenced to a prison term of fifty years to life. Plascencia claims the trial court (1) violated her Sixth Amendment right to confront adverse witnesses when it restricted cross-examination of three witnesses, (2) erred in admitting impermissible evidence, and (3) imposed an unconstitutional sentence enhancement. In addition to these claims, Plascencia avers her trial counsel was ineffective for failing to investigate the criminal background of two jailhouse informants and for failing to object to the admission of certain evidence. We disagree and affirm the district court's denial of Plascencia's habeas petition.

## I

In July 1998, the victim Teresa Silva and the father of her children, Manuel Galdamez, became involved in a dispute with a person whose car was blocking the couple's garage. The person was related to Plascencia. Later that day, Plascencia and her cousin, "Yeni" Haro, went to Silva and Galdamez's apartment, angry that their relative had been "disrespected." Yeni, Silva, and Galdamez lived in the same complex. Plascencia and Yeni challenged Silva to a fight, and the three fought just outside Silva's residence — complete with hair pulling and fisticuffs. Later that day, in yet another battle, Silva and her sisters Joanna and Lisa fought with Plascencia, Yeni, and Yeni's mother. Silva was armed with a baseball bat which she used against Yeni's mother, knocking her unconscious.

Some three months later, Silva and Galdamez were home with their three children, Jesse, Ruben, and Maria. At approximately 8:00 p.m., Galdamez and Ruben went to the garage. Jesse and Maria remained in the apartment with Silva. While Galdamez and Ruben were gone, someone knocked on the door of the apartment. Jesse, who was ten years old at the time, answered the door. The person at the door told Jesse to get his mother and waited at the door while Jesse complied.

When Silva approached the door, followed by Jesse's sister, the visitor shot her twice at close range. The shooter then fled.

Galdamez heard the gun shots from the garage and ran back to the apartment. When his father returned, an astute Jesse called 911 to report the shooting. During that call Jesse did not name the assailant but described her as a female having blonde hair with dark streaks. Galdamez saw Silva and asked Jesse who shot her. According to Galdamez, Jesse answered, "Mara [Plascencia] . . . [t]hat girl that's always with [Yeni]." When the police arrived, Officer Kathleen Bergman interviewed Galdamez. Galdamez described to Officer Bergman the July incidents involving Silva, Mara Plascencia, and Yeni Haro and then stated, "Yeni did it." Galdamez made no mention at that time of Jesse's statement implicating Plascencia.

Several police officers escorted Jesse and his siblings out of their apartment to the apartment of a neighbor, Christal Robertson. At Robertson's apartment, Jesse described the shooting to Officer Rizzo, who asked Jesse whether he knew who the shooter was and whether the shooter was someone in the apartment complex. Jesse responded, "Yeni." Officer Rizzo showed Jesse a picture of Yeni and asked him whether the person in the picture shot his mother; Jesse answered, "No, that's Yeni." Shortly thereafter, another officer, Officer Gill, interviewed Jesse. Jesse initially told Officer Gill that he was unsure who shot his mother, recounting instead that Silva was in a fight with Yeni several months before. Later in the interview, however, Jesse told Gill that Plascencia, not Yeni, shot his mother.

Detective Gloria Boyce also interviewed Jesse. Jesse told Detective Boyce that "Mara" or "Maraca" shot his mother. Jesse said he recognized Mara Plascencia from the altercations in July and from her association with Yeni. Detective Boyce then showed Jesse a picture of Yeni, and Jesse said, "This is Yeni, and she is not the one who shot my mom." Later that evening, Detective Boyce again interviewed Jesse

and showed him a picture of Plascencia, whom Jesse identified as the shooter.

Silva was pronounced dead at 8:40 p.m. that night from a gunshot wound to her chest. A single bullet, which could have been fired from either a .357 or .38 caliber handgun, was recovered from Silva's kitchen.

At approximately 1:30 a.m. the next morning, the police went to Plascencia's apartment, which was located just minutes from the apartment in which Silva was killed. Plascencia was not at home, but her stepfather told police she had been home at approximately 7:00 p.m. or 7:30 p.m., he did not know what time she left, and when he saw her she had auburn colored hair. Plascencia's boyfriend, whom the police also contacted, attempted unsuccessfully to page her numerous times.

At 6:00 p.m. on the day after Silva's murder, Plascencia turned herself in to the San Diego Police Department. She was detained at the Las Colinas Women's Facility and placed in a cell with three other inmates, including Jeannie Johnson and Debra Moore. Subsequently, in separate tape recorded interviews, Johnson and Moore claimed that while in jail, Plascencia had confessed to both of them at the same time to killing Silva. According to Johnson and Moore, who were clearly angling for a deal on their own cases, the killing occurred because Silva had "messed with her family." There were, however, suspicious discrepancies in their stories, the kind of contextual discrepancies that suggest fabrication. Johnson claimed that Plascencia made the confession in the morning at about 8:00 or 9:00 a.m. Moore said that Plascencia made the confession after lunch in the early afternoon. Moore stated that Plascencia was laughing when she demonstrated the shooting by holding up an imaginary gun in her left hand. Moore also told police that Plascencia used a .357 caliber handgun, drove away from the scene, and that Plascencia acknowledged being under the influence of a drug called

"roaches." Johnson said, however, that Plascencia was not laughing but rocking and banging her head against the wall when she made the confession. Johnson said nothing about the caliber of gun or of Plascencia's getaway. Both Johnson and Moore stated that Plascencia was acting strangely while in custody.

Moore, who in the past had "snitched" in exchange for assistance, requested help from the district attorney's office to obtain a parole transfer. Although she stated to the interviewing officer that she did not want them to feel like "I'm asking for a deal or nothing, which I'm not," Moore did say that she wanted to see about "getting the case against her dropped." Moore even tried to get an assurance from the investigating officer that her story was the one the prosecution was going to use.

After giving her original statement to the investigating officer, Moore later called him and said that Plascencia had also told her the gun she used was hidden in the bedroom or the basement of Plascencia's mother's house. Moore told the officer that she had initially withheld evidence about the gun in the house. She told a second officer that she wanted her case dropped. She informed the second officer that she would not testify against Plascencia and then go to prison with her. Moore said that if she did, the moment she got to prison she was going to get a "snitch jacket." Moore indicated also that Johnson, because of her "snitching," was going to have a lot of trouble when she went to prison.

On November 20, 1998, Plascencia was charged by information in San Diego Superior Court. The Information charged Plascencia with murdering Silva in violation of California Penal Code § 187(a). The Information alleged also that Plascencia had used a firearm during the murder and inflicted great bodily injury or death in violation of California Penal Code §§ 12022.5(a)(1) and 12022.53(d).

At a preliminary hearing, the prosecution called Jeannie Johnson and Debra Moore to the stand to testify about Plascencia's supposed confession. Johnson recounted a statement by Plascencia in which Plascencia supposedly admitted shooting the victim twice after asking a little boy to call his mother to the door. Moore, however, took a different tack. Consistent with her threat that she would not testify and then go to jail with Plascencia, Moore claimed a lapse of memory when she took the stand. Nonetheless, Plascencia was held to answer, and the case proceeded to trial.

At trial, the inconsistent statements and identification Jesse gave to the investigating officers at the time of the incident were admitted into evidence, over objection, through the investigating officers. The officers further testified as to the inconsistency between Jesse's initial statement to his father, Galdamez — that Plascencia was the shooter — and Galdamez's subsequent statement to Officer Bergman that "Yeni did it."

After the investigating officers finished testifying, the prosecution called on Galdamez to testify to the jury. On cross-examination defense counsel asked Galdamez who he told the investigating officer "did this." The prosecution objected and the court sustained the objection. However, when confronted later in cross-examination with his statement, "Yeni did it," Galdamez responded that he did not remember making the statement.

The prosecution then called Jesse to the stand.[1] On the stand, Jesse identified Plascencia as the person who shot his mother. In addition to Jesse and Galdamez, the prosecution called on Robertson, the neighbor, and Silva's sister, Joanna, to testify. On cross examination, defense counsel attempted to

---

[1]Jesse's sister, Maria, also testified. She witnessed the actual shooting and said that a woman did it, but she did not get a good look at the woman's face.

question Robertson regarding what Jesse had told him, but the trial court sustained objections to this line of questioning as hearsay. Defense counsel was also not permitted to question Joanna regarding her prior convictions for drug possession and theft because defense counsel admitted that he could not prove the existence of the convictions.

After hearing from these witnesses, the prosecutor called Jeannie Johnson and Debra Moore to testify. At this time, Johnson and Moore were incarcerated in Chowchilla State Prison on felony convictions involving cocaine, facts brought out by the prosecutor on direct examination. Both jailhouse informants testified repeatedly that they could not remember or did not know anything about the case, and that they did not remember being interviewed about Silva's murder. The prosecutor attempted to refresh their memories by playing the beginning portions of their taped interviews. When their memories were not refreshed, with Johnson denying that it was her voice on the tape, the prosecutor gave up trying to elicit evidence from them, and defense counsel had an opportunity to cross-examine.

Defense counsel declined the opportunity to cross-examine Moore. Defense counsel asked Johnson only six questions. The first four questions pointedly addressed Johnson's previous drug convictions. In the last two questions, defense counsel asked Johnson if Plascencia had confessed to her. Johnson responded that she had not.

The prosecution then called the officers who had interviewed Johnson and Moore when they gave their separate statements regarding Plascencia's alleged confession. Plascencia's attorney attempted unsuccessfully to exclude these statements as hearsay, saying, "In fact, I think that if the Court does not sustain my objection, it rises to the level of a due process violation under the Constitution of the United States," citing the Confrontation Clause. Through these officers, the prosecution was able, over the continuing objection of the

defense, to play the tape recordings of the interviews to the jury.

In an attempt to corroborate information in Johnson's and Moore's taped statements, the prosecuting attorney introduced evidence that Plascencia had Rohypnol, the active ingredient in the drug "roaches," in her blood stream when she was arrested. A toxicologist proffered expert testimony regarding the drug's effects and its common methods of use. Plascencia's defense counsel objected unsuccessfully to the expert testimony on relevance grounds.

In a clear attempt to explain how the two jailhouse informants obtained, without talking to her, the information in Plascencia's alleged confessions, defense counsel called Edward Hayes as a witness. Hayes was a friend of Silva's parents. Hayes testified that he learned about the murder from Silva's parents and from the television and later talked about the murder with his girlfriend, Kim Jones, who was incarcerated at the same institution as Johnson, Moore, and Plascencia. Thus, defense counsel suggested that Plascencia had not confessed to Moore and Johnson; rather, the two jailhouse informants had obtained sufficient information from Kim Jones to piece together and to fabricate a confession to trade to the prosecution for leniency in their own cases.

During closing arguments, the prosecutor attempted to explain Jesse's inconsistent identifications of the person who shot his mother. The prosecutor instructed the jury to consider what Jesse had been through and how difficult it would be to witness your mother's murder and then have to recount the story during a criminal trial.[2]

---

[2]Plascencia's attorney presented an expert witness, Dr. Scott Fraser, whose testimony was designed to undercut the child Jesse's eyewitness identification and to support a motion to exclude the identification as untrustworthy. The motion was denied.

On July 23, 1999, the jury found Plascencia guilty on all counts. The superior court sentenced Plascencia to fifty years to life in state prison: twenty-five years to life for murder and a consecutive twenty-five years to life term for the firearm use enhancement. On May 3, 2002, the California Court of Appeal affirmed Plascencia's conviction and sentence. That same day, without written analysis or citation of authority, the California Court of Appeal denied Plascencia's related state petition for a writ of habeas corpus, which included a claim of ineffective assistance of counsel. On July 31, 2002, the California Supreme Court issued a summary denial of Plascencia's petitions for review of her direct appeal and her state habeas petition.

On October 29, 2003, Plascencia filed a petition for a writ of habeas corpus in the district court. She raised six claims. Plascencia argued that the trial court (1) violated her Sixth Amendment right to confront adverse witnesses when it restricted cross-examination of three witnesses — Galdamez, Robertson, and Joanna Silva; (2) erred in admitting sympathy and victim impact evidence; (3) erred in admitting highly prejudicial and improper evidence of Plascencia's drug use; (4) erred in admitting improper opinion testimony in which police officers suggested Plascencia evaded arrest; and (5) imposed an unconstitutional sentence enhancement. She further argued (6) that her attorney rendered ineffective assistance of counsel when he failed to investigate the "background, motives, and interests" of Jeannie Johnson and Debra Moore, the jailhouse informants, and failed to object to testimony regarding sympathy and victim impact evidence, evidence of Plascencia's drug use, and police opinion testimony.

On June 2, 2005, the magistrate judge issued a report recommending the denial of Plascencia's petition. The district judge adopted the magistrate judge's report and recommendation. Plascencia timely appealed.

**II**

We review de novo a district court's decision to grant or deny a 28 U.S.C. § 2254 habeas petition. *Little v. Crawford*, 449 F.3d 1075, 1079 (9th Cir. 2006). Plascencia contends that her petition for a writ of habeas corpus should have been granted for the same six reasons submitted to the district court.

We must "defer to the state court's determination of the federal issues unless that determination is 'contrary to, or involved an unreasonable application of, clearly established Federal law.' " *Himes v. Thompson*, 336 F.3d 848, 852 (9th Cir. 2003) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003)). When reviewing a state court's summary denial of a habeas petition, we "look through" the summary disposition to the last reasoned decision. *See Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)).

**III**

**A**

We first address Plascencia's sixth claim, that her trial counsel rendered ineffective assistance when he (1) failed to investigate the backgrounds, motives, and interests of Johnson and Moore, and (2) failed to object to the sympathy/victim impact, drug use, and police opinion testimony. Because there is no reasoned state court decision denying this claim, we "perform an independent review of the record to ascertain whether the state court decision was objectively unreasonable." *Himes*, 336 F.3d at 853 (internal quotation marks and citations omitted). Accordingly, with regard to Plascencia's claim of ineffective assistance of counsel, the only claim not addressed by a reasoned state court opinion, we will grant Plascencia relief only if our independent review establishes that the denial of that claim was an objectively unreasonable

application of *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In so doing, we examine the complete state court record of the trial.[3]

**[1]** Per *Strickland*, to establish ineffective assistance of counsel, Plascencia must show that (1) her counsel's representation was deficient, falling "below an objective standard of reasonableness," and (2) the deficient representation prejudiced the outcome of her trial, i.e., there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Williams*, 529 U.S. 362, 390-91 (2000).

## 1.

**[2]** We begin by examining Plascencia's claim that her counsel's representation was deficient for failing to investigate the "background, motives, and interests" of Johnson and Moore, the jailhouse informants. Plascencia claims that had trial counsel done so, he would have discovered the snitches were criminals, abused drugs, and were generally untrustworthy. In *Sanders v. Ratelle*, we held that an attorney is ineffective where the attorney neither conducted a reasonable investigation nor had a strategic reason for failing to do so. 21 F.3d 1446, 1456 (9th Cir. 1994) (citing *Hendricks v. Vasquez*, 974 F.2d 1099, 1109 (9th Cir. 1992)). Specifically, Plascencia alleges that her attorney "ignored the testimony of the snitches knowing that the testimony of the snitches would, in some form or another, be admitted before the jury." The record, however, does not support this argument. In fact, when his motion to exclude the informants' out-of-court statements failed, counsel mounted a sustained frontal attack on the informants and their statements. Instead of merely attacking the general credibility of Johnson and Moore, whose per-

---

[3]Neither side has graced us with defense counsel's opening statement, which would be germane to Plascencia's claim of deficient representation. The trial transcript simply says, "reported, but not transcribed herein."

sonal veracity was already put at issue by (1) their own conflicting statements, (2) the fact in evidence that they were in jail on felony controlled substance offenses of their own, and (3) the testimony of the officers who took their initial statements implicating Plascencia, Plascencia's counsel demonstrated how Johnson and Moore could have pieced together the information they provided to the police without talking to Plascencia. Plascencia's counsel elicited testimony from Edward Hayes that he knew Silva's parents, had spoken with them about the murder, had watched television coverage of the case, and had provided that information to his girlfriend, Kim Jones, who was incarcerated in the same cell with Johnson, Moore, and Plascencia. Counsel argued this point to the jury, pointing out also that Johnson received information about the shooting from her father — as revealed by her taped statement.

**[3]** By strategically taking this approach to the testimony, Plascencia's counsel was able to counter the prosecution's closing argument of "how else would Moore and Johnson have this information" unless it came from the defendant. Given the fact that the prosecution made such an argument, and the unpredictable nature of Johnson and Moore as witnesses on direct and cross-examination, Plascencia's counsel's decision to focus on the lack of integrity and the suspicious nature of the information was not only strategic, but professional and intelligent.

Moreover, Plascencia's counsel took the extraordinary step before trial of securing a "keep separate" order with respect to his client and Johnson and Moore during their time in jail prior to the trial. As he explained to the jury in closing argument, this step was designed to prevent the two witnesses from having an opportunity before trial to iron the inconsistencies out of their respective stories and to claim new admissions or threats from the defendant. This tactic is the mark of a wise and experienced lawyer, not one who has no educated

feel for the challenging task of attacking alleged confessions related by jailhouse informants.

To appreciate counsel's strategy and tactics with respect to his defense against Johnson and Moore, one need only to review his closing argument to the jury, in which he tied together his attacks on their credibility and on their character. Counsel began by reviewing California's jury instruction requiring the jury to view "with caution" any evidence of an alleged oral confession made out of court. He then reviewed in detail how Johnson and Moore could have concocted information about the crime, using information from Edward Hayes through cellmate Kim Jones, pointing out that Moore said on the tape recording that she had talked about the crime with Kim Jones, who had told Moore, "I'm going to use this to get out of my case," which is precisely what jailhouse informants bent on securing their own freedom at any price frequently do. *See Commonwealth of N. Mariana Islands v. Bowie*, 243 F.3d 1109, 1123 (9th Cir. 2001); *U.S. v. Bernal-Obeso*, 989 F.2d 331, 334 (9th Cir. 1993). Counsel then explained how a jailhouse informant uses false information as barter or currency to obtain leniency in her own case, a process which, given the nature of criminal informants, suggests a motive to manufacture evidence. This characteristic of jailhouse informants explains the standard jury instruction advising jurors to examine with great care the testimony of a witness who might receive value in return for testimony. *See* 9th Cir. CRIM. JURY INSTR. 4.9 (2003); CALJIC 3.20.[4]

---

[4]                                 **CALJIC 3.20**

The testimony of an in-custody informant should be viewed with caution and close scrutiny. In evaluating this testimony, you should consider the extent to which it may have been influenced by the receipt of, or expectation of, any benefits from the party calling that witness. This does not mean that you may arbitrarily disregard this testimony, but you should give it the weight to which you find it to be entitled in the light of all the evidence in this case.

Counsel reminded the jurors of the base character and background of the informants:

> Now just to be clear — remember. That's why you view these admissions and confessions with caution, just for that reason. Remember where this is coming from. It's not coming from good folks like you. It's coming from people who take drugs. It's coming from people who don't care about anyone else. It's coming from people who time and time again have been inside jail. You don't know how they think. You don't. Don't think well of them. They see a newbie on the block, oh boy, are they going to have fun. And that's what they did.

Then, counsel attacked Johnson's and Moore's stories by reviewing in detail the glaring inconsistencies between them, and offered an explanation for their refusal to testify during the trial:

> Now about inconsistencies between Jeannie Johnson and Debra Moore? Debra Moore says, "She was laughing while she was telling us this story." Jeannie Johnson says, "She was smiling and rocking back and forth." Debra Moore says someone drove her there. Jeannie Johnson says no one drove her there; never mentioned that. Debra Moore says it's a three fifty-seven. Jeannie Johnson says she never mentioned a gun. Debra Moore says Mara told them this story after lunch. We know what time lunch is; we heard it. Jeannie Johnson says it was after breakfast.

---

"In-custody informant" means a person, other than a codefendant, percipient witness, accomplice, or coconspirator whose testimony is based upon statements made by a defendant while both the defendant and the informant are held within a correctional institution.

Debra Moore says, "She demonstrated the shooting in front of us." Jeannie Johnson doesn't remember any awful, grotesque demonstration.

Now we've been told information that snitches don't tell the truth, they say, "I don't remember," when they take the stand because they're so scared. Well what about all the stories we hear about these snitches testifying? Are they not scared? Why do they do it all the time? Snitches testify. You know the number one biggest reason for a snitch not testifying? Because they know they're not telling the truth, and they know they're going to get in big trouble. We also know that snitches love to embellish.

This is a textbook example of exposing fabricated testimony. The essence of the story recounted by two witnesses to the same event may be the same, but it comes apart like a dollar watch when details are explored, details that fabricators do not anticipate, such as what time it was, who was sitting where, how was she behaving, etc.

In addition, through police witnesses Renee Hill and Oscar Valdez, counsel demonstrated that Moore had deceived the authorities on material issues and most probably lied in court. Finally, from counsel's use of police reports and other discovery materials, it is clear that he was well prepared for the trial and to cross-examine the prosecution's witnesses in an attempt to unmask them as liars.

**[4]** In summary, and contrary to Plascencia's claim, counsel did not "ignore the testimony of the snitches" — far from it. This said, we certainly do not disagree that a failure to look into the background of an informant could constitute deficient representation under appropriate circumstances, but this is not such a case.

Moreover, the supposedly overlooked background information, to which Plascencia now refers, about Johnson's and

Moore's general untrustworthiness, was either known by the jury, obvious from the testimony, or of minimal additional probative value, if any. The absence of this marginal background information now claimed to be consequential is certainly not significant enough to undermine confidence in the outcome of the trial.

**[5]** Accordingly, we determine that Plascencia's counsel's representation met *Strickland*'s standard of reasonableness, and even if we were to assume it did not, we would find no prejudice.

**2.**

**[6]** Plascencia's argument that her counsel's performance was deficient for failing to object to sympathy/victim impact testimony, evidence of drug use, and police opinion testimony is equally unpersuasive. As explained *infra* at III D, we disagree with Plascencia's characterization of the evidence. We find no support for Plascencia's assertions that law enforcement ever provided opinion testimony, and we disagree that sympathy or victim impact evidence was presented at trial. Accordingly, we reject Plascencia's contention that her counsel was deficient for not objecting to this evidence. We agree, however, with Plascencia's claim that her counsel should have made a relevancy objection to the toxicologist's testimony regarding the drug Rohypnol.

**[7]** In addition to showing that her counsel's representation was deficient, Plascencia must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Williams*, 529 U.S. at 390-91 (quoting *Strickland*, 466 U.S. at 688, 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the trial. *Sanders*, 21 F.3d at 1461 (quotation marks and internal citation omitted). Here, any prejudicial effect was at best minute. The evidence of drug use was limited to tangential issues that did not prejudice

the outcome of Plascencia's trial. Accordingly, this claim does not satisfy *Strickland*'s second prong.[5]

**3.**

**[8]** We therefore conclude that the state court decision denying Plascencia's ineffective assistance claim was not contrary to, or an unreasonable application of, *Strickland* or an unreasonable determination of the facts in light of the evidence presented.

**B**

**[9]** We address next Plascencia's first claim, that the trial court violated her Sixth Amendment right to confront adverse witnesses when it restricted cross-examination of Galdamez, Robertson, and Joanna Silva. "The Sixth Amendment to the Constitution guarantees the right of an accused in a criminal case to be confronted with the witnesses against him." *Davis v. Alaska*, 415 U.S. 308, 315 (1974). Nevertheless, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things . . . interrogation that is repetitive or marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). Here, any limitation on cross-examination imposed by the trial court was reasonable or harmless.

Plascencia argues that the California Court of Appeal ruling — that the trial court sustained properly an objection on hearsay grounds to defense counsel's inquiry of whether Galdamez initially told police officers that Yeni shot Silva — was an unreasonable interpretation of the facts and an unreasonable interpretation of the law. Whether it was or not, the error

---

[5]Judging from the requests of the jurors during deliberations, they focused on the strength of Jesse's identification, not the snitches' recorded statements.

— if any — was not prejudicial. The statement had already come into the record. Moreover, defense counsel was permitted to ask a variation of the question later during cross-examination. Thus, even if there was an isolated violation of Plascencia's right under the Confrontation Clause, that violation would not have had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993).

Similarly, Plascencia argues the California Court of Appeal unreasonably erred in determining that the trial judge correctly restricted the cross-examination of Robertson on the basis that the evidence sought was "unnecessary and cumulative." Plascencia asserts that the trial court's decision not to allow hearsay testimony from Robertson regarding Jesse's statements to officers in Robertson's apartment violated her Sixth Amendment rights.

**[10]** The trial court determined that because Jesse's initial statement to the investigating officers was previously put into the record by multiple police officers, including the officer who took the statement from Jesse, the evidence was unnecessary and cumulative. There is nothing unreasonable about this conclusion. The testimony was repetitive and cumulative; therefore, it was reasonable in both law and fact for the court to determine that the evidence was unnecessary. Accordingly, the limitations imposed on Plascencia's Sixth Amendment rights are not a basis for granting her habeas petition.

**[11]** Plascencia argues also that the trial court committed constitutional error when it restricted the cross-examination of Joanna Silva regarding her prior criminal convictions for petty theft and drug possession. We disagree. The California Court of Appeal ruled correctly that the trial court did not err because defense counsel was not prepared to prove the fact of the convictions or that the crimes demonstrated "moral turpitude," which is required under California law. *See People v. Castro*, 38 Cal. 3d 301 (1985); California Evid. Code § 788.

Accordingly, Plascencia's Sixth Amendment arguments regarding the cross-examination of Joanna Silva, in addition to those of Galdamez and Robertson, are unpersuasive. *Van Arsdall*, 475 U.S. at 677.

## C

In her second claim, Plascencia contends the trial court erred in allowing sympathy and victim impact evidence in the form of testimony and photographs, and in the prosecuting attorney's closing argument. We disagree.

**[12]** With regard to the testimony given by Galdamez and Lisa and Joanna Silva, Plascencia fails to identify any improper question asked by the prosecution that could plausibly be construed to inflame the passions of the jury. Indeed, the California Court of Appeal concluded correctly that the challenged testimony was "no more than proper background and foundation evidence explaining the relationships of the witnesses and the circumstances leading up to Silva's murder."

Plascencia further contends the trial court erred by allowing several premortem pictures of Silva, including several of Silva with her children. We need not determine whether the trial court erred in this respect. Even if the admission of the photographs was improper, the error could not have had "a substantial and injurious effect on the jury's verdict." *Brecht*, 507 U.S. at 623. Both Jesse and his sister Maria testified at the trial, giving the jury the opportunity to observe their relationships with their mother. We conclude, therefore, that the admission of the challenged evidence did not violate Plascencia's due process rights.

**[13]** Plascencia next argues that the prosecutor's multiple references to Jesse in his closing argument were inappropriate. Specifically, Plascencia contends that the prosecutor's admonitions to consider what Jesse had been through were

improper. Plascencia's argument takes the prosecutor's comments out of context. The prosecutor's statements were made to help explain Jesse's inconsistent identifications of the shooter. There is no indication that the prosecutor ever directed the jury to consider what Jesse had been through for the purposes of determining Plascencia's guilt. We, therefore, reject this argument as well.

## D

In her third and fourth claims, Plascencia avers the trial court erred in allowing improper testimony to be presented to the jury. Plascencia contends the trial court improperly allowed a toxicology expert to give testimony regarding the effects and common method of Rohypnol use. Plascencia argues also that the trial court erred in allowing police opinion testimony regarding her guilt and the police's perception that she was attempting to elude them. Both claims fail to provide a basis for granting Plascencia's habeas petition.

[14] Plascencia's argument with respect to police opinion testimony is without merit. There is no testimony in which any law enforcement officer or witness stated an opinion concerning Plascencia's potential culpability or that she was on the run. The evidence to which Plascencia objects is the testimony investigating officers were able to determine from the witnesses — primarily Jesse — Plascencia's name and physical description, and that the police were initially unable to locate her. The admission of this testimony was, in all respects, proper. We turn, therefore, to the expert toxicologist's testimony.

[15] The presence of drugs in Plascencia's system was relevant to corroborate Moore's recorded statement that Plascencia told her she had been taking the street drug "roaches." Moreover, testimony regarding the physical effects of Rohypnol, an active ingredient in roaches, was also relevant to corroborate Johnson's and Moore's descriptions of Plascencia's

conduct. We recognize, however, that additional testimony —
that Rohypnol was often used as a "follow-up" to heroin or
cocaine or that it was often taken at "raves" — was irrelevant
and should not have been permitted. Nevertheless, to the
extent the trial court erred, we conclude that the admission of
this evidence did not render Plascencia's trial "fundamentally
unfair." *See Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th
Cir. 1991).

## E

Plascencia's fifth claim is that the trial court erred in
imposing the weapons enhancement at her sentencing. Specif-
ically, Plascencia claims her twenty-five years to life sentence
for first degree murder, in addition to her twenty-five years to
life enhancement for using a firearm, is cruel and unusual
punishment and double jeopardy in violation of the Fifth,
Eighth, and Fourteenth Amendments.

The guarantee against double jeopardy includes three dis-
tinct constitutional protections. "It protects against a second
prosecution for the same offense after acquittal. It protects
against a second prosecution for the same offense after con-
viction. And it protects against multiple punishment for the
same offense." *North Carolina v. Pearce*, 395 U.S. 711, 717
(1969); *Brown v. Ohio*, 432 U.S. 161, 165 (1977). Here, Plas-
cencia contends that by imposing an additional twenty-five
years for her use of a firearm, the trial court violated the third
of these guarantees. We disagree.

**[16]** In *Missouri v. Hunter*, 459 U.S. 359, 366 (1983), the
Supreme Court made clear that the protection against multiple
punishments for the same offense did not necessarily preclude
cumulative punishments in a single prosecution. The key to
determining whether multiple charges and punishments vio-
late double jeopardy is legislative intent. *Id*. at 368-69. When
the legislature intends to impose multiple punishments, dou-
ble jeopardy is not invoked. *Id*.

**[17]** Here, the language of California Penal Code § 12022.53 is clear. Subsection (d) provides for a 25 year enhancement when a "firearm is used" to commit murder. There is, therefore, no question as to what the California legislature intended. As described by the California Court of Appeal, the California legislature has simply determined that "a criminal offender may receive additional punishment for any single crime committed with a firearm." Accordingly, we reject Plascencia's double jeopardy argument.

We reject also Plascencia's claim that the enhancement violates the prohibition against cruel and unusual punishment. Plascencia's sentence is neither extreme nor "grossly disproportionate" to the crime. *See Harmelin v. Michigan*, 501 U.S. 957, 996-97 (1991) (rejecting a similar argument to a sentence more harsh than the sentence Plascencia received).

## CONCLUSION

The state court's decision was neither contrary to nor involved an unreasonable application of federal law, and it did not engage in an unreasonable determination of the facts. We therefore affirm the district court's denial of Plascencia's petition for a writ of habeas corpus.

**AFFIRMED.**