Filed 10/26/20  P. v. Lopez CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B302240 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA111011) |
| v. | |
| JUAN ENRIQUE LOPEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Steven D. Blades, Judge.  Affirmed.

Edward H. Schulman, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Blythe J. Leszkay and Yun K. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Juan Lopez appeals from his conviction of first degree murder, premeditated attempted murder, and other offenses.  He argues primarily the trial court erred in failing to instruct the jury on heat-of-passion voluntary manslaughter.  We conclude the evidence did not support such an instruction, and defendant's other arguments are also unpersuasive.  We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

The murder and attempted murder in this case arose from a car-to-car gang shooting, which shortly followed a gang confrontation near defendant's home.

### 1.  *The Gangs*

Defendant is a member of the Ghetto Family gang in Pomona.  A derogatory term for Ghetto Family members, used by rival gangs, is "Gold Fish" or "Fish."  One of Ghetto Family's rival gangs is Raza Unida; the victims in this case were members of Raza Unida.  A derogatory term for Raza Unida members is "Rats."

Defendant and his family lived in a house which was adjacent to a local cemetery.  Although Ghetto Family members would hang out at defendant's house, neither the house, nor the cemetery, was in territory claimed by Ghetto Family.  The area was not claimed by Raza Unida, either, but was traditionally associated with a third, unrelated, gang.

### 2.  *The Confrontation Near Defendant's House*

The shooting in this case was in retaliation for a gang conflict which occurred between defendant and other Ghetto Family members who were relaxing in his yard, on the one side, and, on the other side, several Raza Unida members who were visiting the nearby cemetery.

On October 22, 2015, at around 2:00 in the afternoon, Ghetto Family members, and non-member friends, were in defendant's yard, drinking beer and taking drugs (marijuana and methamphetamine). Defendant and one of the others left to go buy more drugs. Those remaining in the yard included James Barden, who would ultimately be charged with defendant, and a young man known only as Carlos.

At the same time, Raza Unida member Joe Morales (the murder victim in this case), was at the cemetery to visit his brother's grave. Sometime later, he was joined by fellow Raza Unida member Anthony Torres (the attempted murder victim). Torres had a gun. A third man joined them as well.

At some point, the Ghetto Family group in defendant's yard and the Raza Unida group in the cemetery noticed each other. From the yard, Carlos said, "Fuck Rats," jumped over the 5-foot wall separating the yard from the cemetery, and starting running toward the Raza Unida members. Torres flashed his gun. Carlos froze and ran back to safety in defendant's yard.

When defendant and his friend returned from buying drugs, the group in his yard told him what had happened. Defendant and his friend briefly beat up Carlos for jumping over the wall and approaching their rivals.

In the cemetery, several more people had joined the Raza Unida group; they were drinking beer. They were taunting the Ghetto Family group, calling them "Fish" and "Gold Fish."

Defendant turned to Barden and said, "Let's go get these fools." At defendant's urging, Barden got into the driver's seat of a black SUV. Defendant entered the front passenger seat. The others got into another car to follow. As the Ghetto Family group

3

got into their vehicles, they saw the Raza Unida group getting into theirs, one of which was a silver Altima.

Barden believed that he and defendant were "on a mission." The SUV was dangerously low on fuel, and Barden suggested they stop at a gas station. Defendant said, "No, let's go get these fools." Defendant, who was carrying a handgun, had the gun out and ready.

As Barden drove past the entrance to the cemetery, he did not see any of the Raza Unida group still there. He knew a spot where Raza Unida members like to hang out – the home of one of the men who had been at the cemetery – and he believed that was the destination of the Raza Unida members who had left. He drove in that direction.

3.    *The Shooting*

As Barden drove, defendant spotted the silver Altima, and pointed it out to Barden. The car was about a block ahead, stopped at a red light, in the left lane. Barden turned the SUV into the emergency center lane and sped all the way down to where the Altima was stopped. Barden slammed on the brakes, ending up slightly ahead of the Altima; the SUV was in the left-turn pocket, so that the SUV's passenger side was adjacent to the driver's side of the Altima. Barden had also turned the SUV slightly into the lane to his right; he had been trying to cut off the Altima. Morales was in the driver's seat of the Altima; Torres in the front passenger seat.

The passenger window of the SUV was already down. Defendant was wearing a black bandana covering his face from nose to chin. He leaned his upper body out of the passenger window and fired two rounds at the victims. At this point, defendant's gun jammed, and he popped back into the SUV and

4

attempted to unjam the gun.  Torres returned fire, and, once defendant had fixed his jam, bullets flew between the two cars.

Barden completed the left turn and drove off.  As he did, defendant screamed out the window, "Fuck Rats, Ghetto Family!"

Morales had been killed.  Torres was not injured. Defendant had been shot in the eye.

4.    *Other Offenses*

Defendant was taken to a local hospital.  Realizing that defendant's eye injury required a trauma center, which that hospital did not have, one of the nurses said defendant would have to be transferred to Pomona Valley Hospital.  Defendant said, "I'm not going there" and ran out.

In the hospital parking lot, two men in a parked car were talking with a hospital employee standing outside the car. Defendant approached and asked them to drive him to a hospital. The employee told defendant that there was an emergency room right behind him.  Defendant pulled a knife, ordered the two men out of the car, and drove off in their car.

5.    *Charges and Barden's Plea*

Initially, defendant and Barden were both charged with the murder of Morales (Pen. Code, § 187) and the attempted premeditated murder of Torres (§§ 664/187).[1]  Various firearm (§ 12022.53) and gang enhancements (§ 186.22, subd. (b)(1)(C)) were also alleged.  By amended information, defendant was also

---

[1]    All undesignated statutory references are to the Penal Code.

5

charged with two counts of carjacking (§ 215, subd. (a)) with a knife enhancement (§ 12022, subd. (b)(2)).[2]

A second amended information added a charge of accessory after the fact (§ 32) against Barden.  Barden entered a plea of guilty to all of the charges against him (murder, attempted murder, and accessory) and admitted the enhancements.  Barden and the prosecution agreed to a disposition that if Barden testified truthfully at defendant's trial, he could withdraw his plea to murder and attempted murder, those charges would be dismissed, and he would receive a sentence of 7 years on the accessory and gang enhancement charges.

**6.** ***Trial and Defendant's Testimony***

At trial, Barden testified against defendant, specifically stating that defendant was away when Carlos jumped the cemetery wall; there was a verbal altercation between the two gangs; and he would not have driven after the victims were it not for defendant having asked him to do so.  An unaffiliated eyewitness agreed that the passenger in the SUV fired into the Altima before someone in the Altima fired back.

Prior to defendant deciding whether to testify, defense counsel asked whether the court would instruct on self-defense and heat-of-passion manslaughter.  Based on the state of the evidence, the court "would not be inclined" to give the heat-of-passion instruction.  The court said it would wait until defendant testified (or decided not to) before deciding on self-defense.

---

[2]     A gang enhancement was also alleged as to this count, but dismissed at trial.

6

Defendant did testify and geared his testimony toward self-defense.[3] He agreed with some of Barden's testimony: words had been exchanged with the Raza Unida members at the cemetery; he and Barden got into the SUV to go after them; and when Barden pulled up beside their car, defendant leaned out his window and shot into the Altima first. However, defendant's testimony differed from Barden's in several respects: defendant was at the scene when Carlos jumped over the wall, and the initial confrontation with Raza Unida had taken place in defendant's presence. When Carlos started walking toward the Raza Unida members in the cemetery, victim Torres moved the slide to load his gun, pointed it toward the Ghetto Family members, including defendant, and threatened to kill Carlos. After Carlos returned, defendant did not participate in beating him, because his attention was focused on Torres and his gun. Thereafter, the Ghetto Family members started yelling, "Fuck Rats" and both sides shouted back and forth. Defendant saw Raza Unida members, including Torres, get into the Altima.[4] Before he got into the car, Torres stated that they were going to come back. Defendant was concerned. Defendant had his

---

[3]     When defendant was in pretrial custody, authorities recorded a telephone call he had with a friend, in which he discussed the charges against him. His friend said, "Cuz it, yup it was it was self-defense." Defendant responded, "Yeah, well[,] that's that's one way to go about it, but I don't know my boy I'm just waiting to go over there, you know, get my discovery and shit and see how that shit's going."

[4]     Defendant's investigator testified that the distance from the wall surrounding defendant's yard to where the Raza Unida cars were parked was 117 feet.

handgun in his waistband; he kept it on him at all times, fully loaded. He did not pull his weapon at this point; nobody on the Ghetto Family side did.

According to defendant, Barden, of his own initiative, then ran across the street to the SUV and brought it around to the house. Defendant jumped in. He believed there was a chance that the Raza Unida members would go to his house. Barden drove toward the cemetery and continued driving. Defendant felt at ease when he saw the Raza Unida members were no longer at the cemetery because the threat was no longer present. When Barden pulled beside the Altima at the stop light, defendant did not know that this was the same car he had seen at the cemetery. He leaned out his passenger-side window to look into it. He saw Torres pointing a gun at him through the Altima's open driver's side window. To protect himself, defendant pulled his gun and managed to shoot first.

As to his mental state, defendant testified that, during the confrontation at the cemetery, he felt disrespected, angry and afraid. But he confirmed that his emotions dissipated when he saw the Raza Unida members had left the cemetery. He explained, "When we were coming down [the street], we seen they're not in the cemetery any more. So that threat is gone. We are at ease now." Defendant did not feel threatened until after Barden had stopped the SUV next to the Altima and defendant saw Torres aiming a gun at him from the other car.

7.    *Instructions, Verdict and Sentence*

Based on defendant's testimony, the trial court found that instructions on self-defense and imperfect self-defense were justified, but heat of passion instructions were not. The jury was instructed accordingly. On the issue of the degree of murder, the

8

jury was instructed that the murder is in the first degree if it was premeditated or if defendant intentionally shot someone from a motor vehicle with the intent to kill. (CALCRIM No. 521.)

Defendant was convicted as charged. Specifically, he was found guilty of first degree murder on both theories. The jury found true the firearm enhancements under section 12022.53, subdivisions (b) through (d). The jury also found defendant guilty of attempted premeditated murder of Torres, and found true firearm enhancements under section 12022.53, subdivisions (b) and (c). With respect to both counts, the jury found true that defendant committed the offense for the benefit of a criminal street gang. He was also found guilty of two counts of carjacking with the knife enhancement.

Defendant moved for a new trial because the trial court had improperly refused the heat-of-passion voluntary manslaughter instruction. After a spirited argument, the court denied the motion.

Defendant was sentenced as follows: For the murder, a term of 25 years to life, consecutive to a term of 25 years to life for the section 12022.53, subdivision (d) firearm enhancement; for the attempted murder, a term of 15 years to life, consecutive to a term of 20 years for the section 12022.53, subdivision (c) firearm enhancement; for the first carjacking, the high term of 9 years plus 3 years for the knife; for the second carjacking, 1 year 8 months (one-third the middle term). All terms were to run consecutively; sentences on all other enhancements were stayed. Defendant filed a timely notice of appeal.

## DISCUSSION

On appeal, defendant contends (1) the court erred in refusing his request to instruct on heat-of-passion voluntary

9

manslaughter; (2) his counsel rendered ineffective assistance in failing to request an instruction that provocation could weigh against a finding of premeditation; and (3) the weapon enhancement under section 12022.53, subdivision (d), when applied to a murder conviction, constitutes an improper multiple conviction in violation of double jeopardy principles.

1.    ***The Evidence Did Not Support a Heat-of-Passion Voluntary Manslaughter Instruction***

Defendant argues the court erred in denying a heat-of-passion voluntary manslaughter instruction.  Specifically, he contends that the confrontation at the cemetery, in which Torres, a member of a rival gang, threatened his friend, pointed a gun at defendant, and threatened to return were sufficient to provoke a reasonable person, and actually provoked him.  The final act of provocation was when Torres aimed a gun on him when the black SUV pulled up next to the Altima.

We briefly review of some common principles of manslaughter as a lesser included offense to murder. " 'In criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case.  [Citation.]'  [Citations.]  [¶]  ' "To justify a lesser included offense instruction, the evidence supporting the instruction must be substantial—that is, it must be evidence from which a jury composed of reasonable persons could conclude that the facts underlying the particular instruction exist." [Citations.]'  [Citation.]" (*People v. Enraca* (2012) 53 Cal.4th 735, 758.)  "We review the trial court's failure to instruct on a lesser included offense de novo, considering the evidence in the light

10

most favorable to the defendant.  [Citation.]" (*People v. Campbell* (2020) 51 Cal.App.5th 463, 501.)

Manslaughter is a lesser included offense to murder.  Thus, the court must give manslaughter instructions when there is substantial evidence to support conviction of that crime.  (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 301.)  " 'Murder is the unlawful killing of a human being with malice aforethought.  [Citation.]  A murder, however, may be reduced to voluntary manslaughter if the victim engaged in provocative conduct that would cause an ordinary person with an average disposition to act rashly or without due deliberation and reflection.'  [Citation.]" (*People v. Enraca, supra*, 53 Cal.4th at pp. 758–759.)  In such a case, there is no malice.  "Heat of passion is a mental state that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter." (*People v. Beltran* (2013) 56 Cal.4th 935, 942.)  It "is a state of mind caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation.  While some measure of thought is required to form either an intent to kill or a conscious disregard for human life, a person who acts without reflection in response to adequate provocation does not act with malice." (*Ibid.*)  Heat-of-passion voluntary manslaughter "requires a showing of adequate provocation, which has both a subjective and an objective component.  [Citation.]  The defendant must actually and subjectively kill under the heat of passion, but the circumstances giving rise to the heat of passion are also viewed objectively to determine whether the ' "circumstances were sufficient to arouse the passion of the ordinarily reasonable man." '  [Citation.]" (*People v. Gonzales and Soliz, supra*, 52 Cal.4th at p. 301.)

11

Here, the evidence fails to support the subjective element of provocation; there is no evidence that defendant was actually and subjectively provoked at the time he fired into the Altima. Specifically, there is insufficient evidence for defendant's assertion that he was provoked to act rashly by the confrontation at the cemetery. Defendant admitted at trial that he had a loaded .45 in his waistband at the time his passions were purportedly aroused, but he made no unconsidered effort to shoot at the Raza Unida members when they provoked him with threats. Instead, he got in the SUV with Barden and followed them, indicating, at the very least, that defendant was in sufficient control of his faculties to not shoot blindly in passionate response to the supposed provocation. Instead, he rationally held back and chased after them.

Even if we were to assume defendant felt provoked during confrontation at the cemetery, defendant admitted that, when he and Barden drove past the cemetery and saw that the Raza Unida vehicles were gone, defendant felt "at ease" because the threat was "gone." To the extent defendant suggests that his passion was in some way reignited when he and Barden caught up with the Altima and Torres pointed a gun at him, defendant's testimony was again to the contrary. In support of his self-defense argument, defendant testified that when he saw the gun aimed at him, he thought he was going to get shot, so he made the decision to fire out of self protection. "Defendant's own uncontested testimony established he did not act rashly, or without due deliberation and reflection, or from strong passion rather than from judgment, when he claimed to have [acted in self-defense to fend off an attacker]." (*People v. Moye* (2009) 47 Cal.4th 537, 541.) Defendants' testimony here was that he

acted in self-defense, a theory on which the jury was instructed and which the jury rejected.[5]

## 2. *Trial Counsel Did Not Render Ineffective Assistance of Counsel in Failing to Request an Instruction that Provocation Weighs Against Premeditation*

A jury may be instructed that provocation inadequate to reduce a killing from murder to manslaughter nonetheless may suffice to negate premeditation and deliberation, thereby reducing the crime to second degree murder.  (*People v. Rogers* (2006) 39 Cal.4th 826, 877–78.)  This is a pinpoint instruction which must be requested by counsel; it need not be given on the court's motion.  (*Id.* at p. 878.)  Recognizing this, defendant argues his trial counsel rendered ineffective assistance by not requesting the instruction.[6]

---

[5]     Because we resolve the appeal on the subjective element of voluntary manslaughter, we need not address the objective element.  We observe that the bulk of defendant's briefing on appeal addresses the objective element – specifically, whether gang challenges can constitute provocation.  (E.g., *People v. Minifie* (1996) 13 Cal.4th 1055, 1060 [evidence of third-party threats may be admissible on self-defense if there is evidence the defendant reasonably associated the victim with those threats].)  But *Minifie*, on which defendant relies, resolved an evidentiary issue related to self-defense, not an instructional issue as to voluntary manslaughter, and is therefore irrelevant.

[6]     In connection with defendant's argument that the court erred in failing to instruct on voluntary manslaughter, the Attorney General argues that any error was necessarily harmless because the jury found that defendant premeditated the murder.  (See *People v. Peau* (2015) 236 Cal.App.4th 823, 830–832 [when the jury is properly instructed on premeditation, a finding of

13

" 'In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome.' " (*People v. Carter* (2005) 36 Cal.4th 1114, 1189.)  We presume "counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy.  Defendant thus bears the burden of establishing constitutionally inadequate assistance of counsel.  [Citations.]  If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation." (*Ibid.*)

Here, the record does not expressly indicate why counsel did not request this instruction, but at least two potential rational explanations exist:  (1) the evidence did not support such an instruction; and (2) the instruction, if given, could have made no practical difference on defendant's conviction.  As to the first, we have already discussed that the evidence of subjective

premeditation would be inconsistent with heat of passion].)  Defendant's argument regarding the premeditation instruction is, in effect, a preemptive strike against the Attorney General's argument.  The premeditation finding could not render the failure to instruct on voluntary manslaughter harmless if the premeditation instruction was itself erroneous.  Our conclusion that the premeditation instruction was appropriate is an additional reason to reject defendant's argument on the court's failure to instruct on voluntary manslaughter.

provocation was insufficient. As to the second, the jury was properly instructed on two bases for finding the murder to be in the first degree: one, premeditation and, two, committed by shooting from a motor vehicle. Even if defendant had obtained this instruction and it had an effect on the jury's finding of premeditation, his murder conviction still would have been in the first degree because he indisputably fired from a motor vehicle with the intent to kill.[7]

### 3. *There is No Improper Multiple Conviction*

Defendant's murder conviction was enhanced under section 12022.53, subdivision (d). That subdivision provides that any defendant committing one of several enumerated crimes, including murder, who "personally and intentionally discharges a firearm and proximately causes great bodily injury . . . or death,

---

[7] Anticipating this argument, defendant takes the position that his counsel rendered ineffective assistance by not *also* requesting the instruction be modified to apply to the shooting from a motor vehicle basis for first degree murder. Defendant suggests "there is no principled reason why a defendant's subjective belief in provocation cannot also be invoked as a basis for negating the element of *intent-to-kill* within the context of first degree murder based on the discharge of a firearm from a motor vehicle and thereby allow for a second degree murder verdict based on implied malice." Defendant cites no authority for this proposition. We conclude trial counsel could have made the reasonable tactical decision to not pursue a pinpoint instruction which would have no practical effect on his first degree murder conviction without a modification of the instruction for which appellate counsel can offer no legal basis. Trial counsel could have reasonably concluded the only successful outcomes obtainable for defendant were an acquittal based on self-defense or manslaughter based on imperfect self-defense.

to any person other than an accomplice, shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life." Reasoning that anyone who uses a firearm in a murder will, by definition, cause death to another person, defendant argues that applying this enhancement to murder is, in effect, an impermissible multiple conviction which violates double jeopardy principles.

Defendant concedes the law is against him and that he is simply raising the issue to preserve it. He is correct about California law: our Supreme Court rejected this argument in *People v. Izaguirre* (2007) 42 Cal.4th 126, 128–130. The Ninth Circuit is in accord. (*Plascenia v. Alameida* (9th Cir. 2006) 467 F.3d 1190, 1197–1204 [rejecting double jeopardy complaint with respect to a section 12022.53, subdivision (d) firearm enhancement to a murder conviction].)

### DISPOSITION

The judgment is affirmed.


RUBIN, P. J.

WE CONCUR:


BAKER, J.


KIM, J.


16